521 F.2d 1289
 Janet R. JOHNSON, Trustee, Plaintiff-Appellee,
v.
Richard SERRA, et al., Defendants-Appellees,
and
Milgo Industrial, Inc., a corporation, and Milgo Art(s)
Systems, Inc., Defendants and Third-Party
Plaintiffs-Appellants,
v.
Pratt's Express Company, Third-Party Defendant-Appellee.
 Nos. 74-1721, 74-1760.
 United States Court of Appeals,
Eighth Circuit.
 Submitted March 10, 1975.
Decided June 30, 1975.
 
 John E. Castor, and Robert J. McGuire, Minneapolis, Minn., for appellants, Milgo Art(s) Systems, Inc., and Milgo Industrial, Inc.
 Charles T. Hvass, Minneapolis, Minn., for appellee, Janet R. Johnson.
 Robert M. Wattson, Minneapolis, Minn., for appellee, Richard Serra.
 Graham Heikes, St. Paul, Minn., for appellee, Pratt's Express Co.
 Before GIBSON, Chief Judge, CLARK, Associate Justice, Retired,* and LAY, Circuit Judge.
 GIBSON, Chief Judge.
 
 
 1
 Defendants Milgo Industrial, Inc., a steel fabricator, and Milgo Art(s) Systems, Inc., its broker,[1] fabricated a massive steel sculpture using plans developed by defendant Weidlinger Engineering from a design of defendant artist Richard Serra. Serra's "Sculpture No. 3" consisted of two 21/4 inch thick, 8 foot square steel plates weighing 5,212 pounds each, standing in slots in a 7-inch diameter, 121/2 foot long cylindrical steel floor bar. Plaintiff's husband, Raymond Johnson, was a rigger-mover for the third party defendant, Pratt's Express Company, who contracted to assemble the sculpture at the Walker Art Center in Minneapolis. Johnson was killed November 18, 1971, when one of the plates broke loose from its support and fell on him. Plaintiff brought this diversity suit against the above defendants under the Minnesota wrongful death statute, Minn. Stat. § 573.02 (1971).
 
 
 2
 The case was tried to a jury which found Serra and Weidlinger free of negligence. However, it determined that Milgo and Pratt's were negligent and apportioned negligence between them at 85 percent and 15 percent respectively under Minnesota principles of comparative negligence. The jury awarded $505,092 in damages. The District Court granted judgment to Pratt's on Milgo's third party complaint despite the jury's finding that Pratt's was 15 percent causally negligent.
 
 
 3
 Milgo contends on appeal that (1) despite negligent fabrication it is not liable for Johnson's death because of Pratt's superseding negligence in failing to follow written assembly instructions; (2) the admission of expert economic testimony as to the impact of future inflation on damages was error, causing the jury to return an excessive verdict; and (3) the District Court's denial of contribution or reduction of the judgments against Milgo in view of Pratt's 15 percent comparative negligence was violative of due process. We affirm the judgment of liability but reverse and remand for a remittitur or new trial solely on the issue of damages.
 
 
 4
 The fatal sculpture was designed to convey a precarious "house of cards" appearance through arrangement of its large steel plates, although the plates were designed to be firmly and safely connected when assembled so that people could walk around and between them. The primary notched support bar was designed by Weidlinger to be made from solid steel and was intended to be able to safely accommodate plates four times the weight of those actually used.
 
 
 5
 Milgo, however, because of scheduling difficulties, did not cut the notches into the bar with heavy machinery but instead flame-cut large sections through the bar and welded the remaining pieces to form notches. This considerably lessened the tensile strength of the support bar. Additionally, the plaintiff offered proof that Milgo's notch-welds were defective and deceptively camouflaged with rust to make the support bar appear solid as shown in the plans. Milgo had fabricated two prior Serra sculptures using the same technique without difficulty or objection.
 
 
 6
 Serra's "Sculpture No. 1" was erected by Pratt's at the Walker Art Center without incident six months prior to the accident, using the same crew of which Johnson was a member. The Weidlinger assembly instructions called for the plates of both sculptures to be braced during assembly and for shims to be inserted into the support slots to hold the plates in place until connected to each other. No plate braces were used by the Pratt's crew on either occasion. On the second occasion the crew had difficulty positioning the plates to touch each other and chose to further disregard the instructions by removing shims from the slot holding one of the plates. This was done in order to shift the plate to its proper position so that both plates would meet to form the apex of a triangle. The plate left standing free fell when one of Milgo's defective slot-welds failed. The jury apportioned negligence for the accident 85 percent to Milgo's defective welds in the base of the sculpture and 15 percent to Pratt's failure to observe suggested precautions in assembly.
 
 
 7
 I. Proximate Causation.
 
 
 8
 Milgo seeks to avoid all liability for the negligently constructed support bar under the doctrine of superseding intervening cause. It claims Pratt's foreman's negligent failure to follow the Weidlinger assembly instructions was the sole proximate cause of the accident or, alternatively, that the court should have submitted the causation issue to the jury by instructing on superseding or intervening cause. It argues that if both plates had been braced and shimmed as provided in the instructions,[2] the fatal steel plate could not have fallen, even assuming Milgo's notch-welds were faulty.
 
 
 9
 We believe there was sufficient evidence from which the jury could find that the defective rewelding of the support bar was an ongoing continuous cause that combined with Pratt's negligence to bring about the accident.[3] Pratt's slight (15%) negligence did not break the chain of causation to relieve Milgo of liability.
 
 
 10
 A superseding cause is an intervening act of a third person that cuts off the original actor's liability for harm to another which his antecedent negligence was a substantial factor in bringing about. Restatement (Second ) of Torts § 440 (1965). The Minnesota courts have discussed superseding cause as a question of continuation of the duty owed by the original defendant to the injured plaintiff:
 
 
 11
 (W)as the duty of the first wrongdoer a continuing one or was it something that had come to rest? If it was a continuing duty, the first wrongdoer would not be relieved from the consequences of his negligence merely because another concurring act of negligence came into play to bring about the result.
 
 
 12
 Mikes v. Baumgartner, 277 Minn. 423, 430, 152 N.W.2d 732, 737 (1967).
 
 
 13
 For Pratt's negligence to supersede that of Milgo under Minnesota law, four elements must have been satisfied: (1) its effects must have occurred after the effects of Milgo's negligence; (2) it must not have been brought about by Milgo's original negligence; (3) it must have actively worked to bring about a result that would not otherwise have followed from Milgo's original negligence; and (4) it must not have been reasonably foreseeable by Milgo. Kroeger v. Lee, 270 Minn. 75, 78-79, 132 N.W.2d 727, 729-30 (1965); See Restatement (Second) of Torts §§ 442B and 447(a) (1965).
 
 
 14
 In the instant case all four elements are missing in varying degrees. Milgo's negligence preceded Pratt's but was continuous and ongoing. Its effects were concurrent with the effects of Pratt's lesser negligence. The accident would likely have followed from Milgo's negligence alone. Moreover, Pratt's negligence was reasonably foreseeable by Milgo, as was the resulting accident. Thus, Milgo's negligence was a direct and concurring cause of the fatal accident and it is not relieved of liability by Pratt's lesser culpability.
 
 
 15
 II. Expert Economic Testimony on Future Inflationary Trends.
 
 
 16
 Milgo challenges the admission of plaintiff's expert economic testimony projecting future inflationary trends to estimate the decedent's lost future earnings. Milgo recognizes that expert economic testimony as to lost future earnings is generally admissible, but contends that plaintiff's expert, Dr. Edward M. Foster, Associate Professor of Economics at the University of Minnesota, led the jury to return an excessive verdict. Milgo argues that the jury speculated on unfounded assumptions concerning possible future inflation in place of calculating damages on presently known facts.
 
 
 17
 Plaintiff responds that sufficient foundation was laid for the testimony and that it was necessary to help the jury assess economic factors affecting the measure of damages.[4] Moreover, she argues, defendants had ample opportunity to cross-examine Dr. Foster more thoroughly and to present their own counter experts but failed to do so. While the latter contention may have merit, our task is limited to determining whether the trial court abused its discretion in admitting Dr. Foster's testimony as relevant on the issue of damages or that the verdict is otherwise excesive. Krall v. Crouch Brothers, Inc., 473 F.2d 717, 719 (8th Cir. 1973). We believe the court did abuse its discretion in admitting Dr. Foster's testimony as it was too speculative and conjectural, thus lacking sufficient probative value to outweigh the danger that it would lead the jury to assess damages on an improper basis.[5] Riha v. Jasper Blackburn Corp., 516 F.2d 840 (8th Cir. 1975); Bach v. Penn Central Transportation Co., 502 F.2d 1117 (6th Cir. 1974).
 
 
 18
 Decedent Johnson, age 34, was survived by his wife, age 36, and four children, age 13 and under. Although he wore a hearing aid, he was otherwise in good health at the time of his death. He was a member of the Teamsters Union, trained in auto mechanics at a vocational high school, and worked as a rigger-mover for Pratt's for nine years prior to his death. According to plaintiff's economic expert, Johnson would have earned $18,516 from all sources in 1971, the year of his death. The jury was instructed that mortality tables showed Johnson's remaining life expectancy to be 36.4 years. Dr. Foster estimated $481,005 as the loss in future earnings. The jury returned a verdict of $505,092. It apparently accepted Dr. Foster's analysis without testing the reasonableness of his mathematically derived result.[6] The figures cited in the margin[7] reflect the great extent to which the $505,092 verdict exceeds conventional actuarial predictions of the value of a comparable annuity.
 
 
 19
 Although carefully constructed expert testimony is one factor relevant to the jury's consideration of the ultimate figure to be set as compensatory damages, many other equally imprecise and conjectural factors may well enter into the loss of future earnings. And even though an award of damages in a Minnesota wrongful death action includes many factors, tangible and intangible, in addition to lost future earnings, the damages awarded must be subject to some reasonable limitation.[8]
 
 
 20
 Inflationary forecasts of economists are, of course, only personal opinions, even when based on past trends. It must be recognized that trends may often be faulty indicators of the future as well as the present and that economists have fared only slightly better than fortune tellers and soothsayers in foretelling the future. Economic factors operate at varying degrees of intensity in our economy, and it seems there are as many explanations of past trends and predictions of future trends as there are economists. We could be entering into an inflationary cycle with its attendant depreciation of the dollar or into a deflationary era, as in the 1930's. Both possibilities are to a considerable extent speculative and conjectural. A jury impressed with the recent precipitous decline in the value of the dollar may be tempted in making a present award for damages to impose the fiscal sins and irresponsibilities of the past upon a defendant in the belief that they will continue in the future. Yet pretermitting consideration of declining purchasing power may allow a defendant to escape liability for a substantial portion of the future damage caused by its negligent acts.
 
 
 21
 Authorities are split on this difficult question of whether juries should be encouraged to consider future inflationary trends eroding the purchasing power of money in assessing damages, and we recently faced the issue for the first time in Rhia v. Jasper Blackburn Corp., supra, a Nebraska diversity injury case.[9] Some courts have suggested that the topic of future inflation is beyond the competence of any jury or that it leads to confusion over collateral issues; others have viewed inflation as a fact of life not to be realistically ignored.
 
 
 22
 The measure of damages and consequently the limits of relevancy in this diversity case are set by the substantive law of Minnesota. See Willmore v. Hertz Corp., 437 F.2d 357, 360 (6th Cir. 1971); Southern Pac. Co. v. Zehnle, 163 F.2d 453, 454 (9th Cir. 1947); 1A Moore's Federal Practice § 0.310 at 3403 n. 17 (2d ed. 1974).[10] Recoveries for wrongful death in Minnesota are limited to "such an amount as the jury deems fair and just in reference to the pecuniary loss resulting from such death,"[11] and should be reduced to present worth.[12] Minnesota juries, in assessing the amount of damages in death and injury cases, may consider "the inflationary trend of the economy," or "the present low purchasing value of money and the high cost of living."[13] However, we have found no Minnesota case approving the use of an expert's long-range projection of future inflationary trends to assist the jury in determining damages.
 
 
 23
 Many other federal courts in cases governed by state law have permitted consideration of the impact of inflation on damages if allowed by state law.[14] Others have disallowed it, apparently believing rejection to be the majority rule or assuming state law would disallow it.[15] If the instant case were a Jones Act, FELA or other federally created claim, the evidence of future inflationary trends and their impact on the value of the dollar would probably be considered too speculative and conjectural to be admitted. The federal circuits that have faced the issue in cases involving federally created claims, governed by federal rather than state law, have for the most part rejected testimony, jury instructions or trial court consideration of future inflationary trends in damage assessment.[16]
 
 
 24
 In view of Minnesota's recognition of inflationary trends as an element of damages, we think that plaintiff would be allowed to introduce expert opinion evidence "to show that raises in income or promotions would most probably occur" following the middle ground position articulated in Bach v. Penn Central Transportation Co., 502 F.2d 1117, 1122 (6th Cir. 1974). It does not follow, however, that the Minnesota rule of damages would permit speculation on future inflationary trends to arrive at a specific dollar figure supposedly equatable with the decedent's income adjusted for possible future inflation through the year 2002.
 
 
 25
 As noted by the Ninth Circuit in United States v. Furumizo, 381 F.2d 965, 970 (9th Cir. 1967):
 
 
 26
 (W)e must remember that the ultimate total damage figure awarded is the sum of a series of predictions, none of which involves mathematical certainty, and that it is the reasonableness of the ultimate figure that is really in issue * * *.
 
 
 27
 Furthermore, we think the Supreme Court of Minnesota would take the more moderate view suggested by the Sixth Circuit in Bach v. Penn Central Transportation Co., supra at 1122:
 
 
 28
 (T)he predictive abilities of economists have not advanced so far that they can forecast with any certainty the existence and rate of inflation for the next thirty years. Limited use of economists and other experts may be appropriate in some cases to show that raises in income or promotions would most probably occur. Yet testimony on the exact income that the decedent would have received through the year 2002 is so speculative in our view, that it is inadmissible.
 
 
 29
 We do not hold, however, that the jury may never consider inflation and future increases in income in determining damages. $ $ $ Some consideration of probabilities is inevitable in any fair award of damages. The court's role is to keep such extrapolations within reasonable bounds and insure that they conform to the evidence.
 
 
 30
 * * * (Moreover), it was * * * error for the district court to charge the jury that it should not consider "future increases or decreases in the purchasing power of money." Inflation is a fact of life within the common experience of all jurors. Admittedly, if the jury considers this issue without expert testimony, their calculations will be even more imprecise. * * * But if jurors should be prohibited from applying their common knowledge of inflation in reaching a verdict, the party entitled to recovery could be grievously undercompensated. The court can always rectify an exorbitant verdict through its power of remittitur. (Citations omitted.)
 
 
 31
 In sum, Dr. Foster's testimony in the instant case, as that in the Bach case,[17] lacked sufficient evidentiary foundation as projections of distant Future inflationary trends inevitably must. His testimony on future inflationary projections to the year 2002 should, therefore, have been excluded as speculative and the excessive verdict obviously derived from it must be reduced or, in the alternative, a new trial granted. Riha v. Jasper Blackburn Corp., 516 F.2d 840 (8th Cir. 1975).
 
 
 32
 III. Contribution or Reduction of Judgment.
 
 
 33
 Finally, Milgo claims contribution from Pratt's or a reduction of plaintiff's judgments proportionate to Pratt's jury-assessed fault notwithstanding Pratt's payments of state workmen's compensation to the plaintiff which subrogated it to the employee's rights against Milgo.[18] Alternatively, it requests that we certify its contribution claim to the Supreme Court of Minnesota under Minn.Stat. § 480.061 (Supp.1973) for lack of a controlling state precedent.
 
 
 34
 Contribution in Minnesota and elsewhere is granted on the basis of common liability between joint tortfeasors and rests on principles of equity. Although disallowed at common law, contribution is granted in Minnesota and a growing number of jurisdictions as restitution to one who has discharged more than his fair share of common fault. Hendrickson v. Minnesota Power & Light Co., 258 Minn. 368, 370-71, 104 N.W.2d 843, 846-47 (1960). Common liability exists if two defendants are independently liable to the plaintiff for the same damages. Farmers Insurance Exchange v. Village of Hewitt, 274 Minn. 246, 249, 143 N.W.2d 230, 233 (1966). However, if the substantive law denies the plaintiff a right of action against the third party defendant, the third party plaintiff cannot recover contribution from him either, even though the joint negligence of both defendants concurrently caused the plaintiff's injury. Contribution is not permitted without common liability. Guillard v. Niagara Machine & Tool Works, 488 F.2d 20, 22-23 (8th Cir. 1973).
 
 
 35
 As between Milgo and Pratt's, common liability was eliminated when Pratt's paid workmen's compensation to the plaintiff. While the Minnesota workmen's compensation statute[19] directly controls only rights between employer and employee, it necessarily affects a third party tortfeasor's right to contribution if his negligence along with that of the employer concurrently caused injury to the employee. Hendrickson v. Minnesota Power & Light Co., supra at 849. Because the statute eliminates the employee's right of action against the employer, it also eliminates common liability between the joint tortfeasors and leaves no ground for allowing contribution. Guillard v. Niagara Machine & Tool Works, supra at 23.
 
 
 36
 Milgo concedes that its claim would extend the law of contribution in Minnesota but nevertheless argues that the indirect statutory denial of its common law right to contribution without provision for a reasonable substitute denies due process. It relies on the recent holding in Carlson v. Smogard, 298 Minn. 362, 215 N.W.2d 615 (1974),[20] that Minnesota's purported express statutory elimination of a third party tortfeasor's common law right of indemnity against the employer violated due process where the third party's culpability was slight and the employer's great.[21] See also Haney v. International Harvester Co., 294 Minn. 375, 201 N.W.2d 140 (1972). The District Court, however, rejected Milgo's claim and refused to certify the question to the State Supreme Court under Minn.Stat. § 480.061 (1971).
 
 
 37
 While we are not averse to certifying issues of this type involving state law, we agree with the trial court's refusal to do so here because we are satisfied that the Minnesota court in Haney and Carlson adequately defined the parameters of the change in the state's law of restitution between joint tortfeasors for the trial court to determine what the State Supreme Court would declare state law to be with respect to a contribution claim on these facts. See Guillard v. Niagara Machine & Tool Works, supra at 24-25. We also give deference to the District Court's analysis of state law and its better position to evaluate the facts. Halvorsen v. Dunlap, 495 F.2d 817, 821 (8th Cir. 1974).
 
 
 38
 Milgo's demand for contribution or a reduction of judgment proportionate to Pratt's degree of fault was properly denied. Milgo's 85 percent culpability was comparatively much greater than Pratt's 15 percent, thus eliminating the great injustice that compelled the constitutional holding of Carlson particularly in view of Minnesota's adoption of comparative negligence principles in allocating fault between plaintiff and defendant.[22] Moreover, Carlson dealt only with indemnity, not with contribution, and intimated no concern with Minnesota's traditional abrogation of the third party tortfeasor's right of contribution by eliminating common liability between him and the employer. We interpret the Carlson court's reaffirmation of the rules governing indemnity, stated in Hendrickson v. Minnesota Power & Light Co.,supra, as support for the Hendrickson court's comments concerning contribution as well. Because Milgo's comparatively greater culpability forecloses its claim for contribution or reduction of judgment from Pratt's, we need not reach the constitutional issue whether the Minnesota workmen's compensation statute's indirect elimination of common tort liability, and in turn contribution, deprived Milgo of property without due process of law.
 
 
 39
 The judgment in favor of third party defendant Pratt's is affirmed. The judgment fixing liability of the defendant Milgo is affirmed; the money judgment is vacated and remanded to the District Court, with directions to grant a remittitur, or at plaintiff's election to grant a new trial on damages only.
 
 
 40
 Milgo and Johnson to bear their own costs; remaining costs to be taxed against Milgo.
 
 
 
 *
 Associate Justice Tom C. Clark, United States Supreme Court, Retired, sitting by designation
 
 
 [1]
 The two Milgos are hereafter referred to jointly as Milgo because their interests on appeal are identical. They filed joint briefs on appeal and suffered joint and several judgments in the court below
 
 
 [2]
 The assembly instructions stated:
 Erection Notes
 No. 1 Erect plates at proper angles and brace.
 No. 2 Wedge plates to prevent movement. Wedges are permanent Do not remove.
 No. 3 Remove bracing. Do not remove wedges.
 
 
 [3]
 There was substantial testimony to the effect that if the notches had been milled into the solid bar rather than accomplished by flame-cutting and rewelding, the bar would have safely held the plates during assembly without bracing
 
 
 [4]
 In ruling on Milgo's post-trial motion, the District Court commented:
 (T)he testimony of the reputable economist was properly received. The jurors know of the generally increasing wage rates since World War II and know that the pattern in most industry and Government employment is an increase of about 5.5% Per year, and know that this pattern will most likely be true in the future. * * * The jurors have this knowledge based on their own information and experience. The assistance of an expert economist can nevertheless be helpful in assessing various economic factors including wage, interest and other rates. * * * Defendants knew that they were faced with a substantial damage claim and could have produced an economist or possibly an actuary to establish other damage measurements. The Court might have found lesser or greater damages.
 
 
 [5]
 Specifically, Dr. Foster testified that since 1947 the average annual yield on conservative investments such as U.S. Treasury Bonds has been 4.1 percent and the average annual wage increase for teamsters has been 5.6 percent. His thesis was that the differential between the two has been and will remain constant at 1.5 percent and that the decedent's income and cost of living would have increased at a rate 1.5 percent greater than the current yield on conservative investments in any given year. He projected the total loss in earnings to be $546,597, using Johnson's estimated 1971 gross income of $18,516, reduced 15 percent for taxes to $15,739. From this he deducted 12 percent for the cost of Johnson's personal consumption no longer borne by the family after his death, for a net total of $481,005, not including $30,700 in lost wages for the time between death and trial
 
 
 [6]
 The Minnesota Supreme Court has expressed concern over juries' misapplication and unwitting acceptance of mathematical formulas in assessing damages "without testing the reasonableness of the award in light of its overall effect." Sorenson v. Cargill, Inc., 281 Minn. 480, 489, 163 N.W.2d 59, 66 (1968); Thill v. Modern Erecting Co., 272 Minn. 217, 233, 136 N.W.2d 677, 688 (1965); McCrank v. Great Northern Ry., 260 Minn. 329, 333, 109 N.W.2d 582, 585 (1961); Hallada v. Great Northern Ry., 244 Minn. 81, 98, 69 N.W.2d 673, 687, Cert. denied, 350 U.S. 874, 76 S.Ct. 119, 100 L.Ed. 773 (1955); Ahlstrom v. Minnesota, St. P. & S. St. M. R.R., 244 Minn. 1, 30, 68 N.W.2d 873, 891 (1955)
 
 
 [7]
 Although not accounting for inflation, the following table indicates the approximate present cash values of 28-year semi-annual annuities of various investment rates and payments:
 Approximate
 Annual Payment Interest Rate Present Worth
 -------------- ------------- -------------
 $15,000 3.0% $282,794
 18,000 3.0% 339,353
 15,000 6.0% 202,241
 18,000 6.0% 242,689
 15,000 6.5% 192,280
 18,000 6.5% 230,737
 See D. Thorndike, The Thorndike Encyclopedia of Banking & Financial Tables 6-294, 6-306, 6-308 (1973).
 
 
 [8]
 If the $505,092 were invested at an annual yield of 6.5 percent, as suggested by Dr. Foster, it will earn $32,831 in the first year alone nearly double the decedent's annual income in the year of his death. And, according to Milgo's undisputed calculations, if annual payments to the family beginning at $15,379 are increased 8 percent each year to correspond with Johnson's anticipated wage increases, the principal amount will remain wholly untouched for the first 21 years, and total payments over 28 years until the decedent's retirement at age 65 in the year 2002 will exceed $1,500,500 with the decedent's imaginary income in the final year at a staggering $125,724, and the principal not yet completely exhausted
 
 
 [9]
 See also Beanland v. Chicago, R.I. & P. R.R., 480 F.2d 109, 117 (8th Cir. 1973) (Bright, J., concurring)
 
 
 [10]
 Cf. Chesapeake & O. Ry. v. Kelly, 241 U.S. 485, 491, 36 S.Ct. 630, 632, 60 L.Ed. 1117 (1916), in which the Court established the requirement that verdicts in FELA cases be discounted to present value, noting that:
 (I)t may be a difficult mathematical computation for the ordinary juryman to calculate interest on deferred payments, with annual rests, and reach a present cash value. Whether the difficulty should be met by admitting the testimony of expert witnesses * * * (l)ike other questions of procedure and evidence, * * * is to be determined according to the law of the forum.
 But the question of the proper measure of damages is inseparably connected with the right of action * * *. (Emphasis added.)
 
 
 [11]
 Minn. Stat. § 573.02, subdivision 1 (1971). See generally Fussner v. Andert, 261 Minn. 347, 352-54, 113 N.W.2d 355, 358-60 (1962)
 
 
 [12]
 See Hallada v. Great Northern Ry., 244 Minn. 81, 95, 69 N.W.2d 673, 685, Cert. denied, 350 U.S. 874, 76 S.Ct. 119, 100 L.Ed. 773 (1955)
 
 
 [13]
 Moteberg v. Johnson, 297 Minn. 28, 210 N.W.2d 27 (1973) (injury); Young v. Hansen, 296 Minn. 430, 209 N.W.2d 392 (1973) (injury); Wiest v. Twin City Motor Bus Co., 236 Minn. 225, 52 N.W.2d 442 (1952) (injury); Holz v. Pearson, 229 Minn. 395, 39 N.W.2d 867 (1949) (death); Nubbe v. Hardy Cont. Hotel Sys., 225 Minn. 496, 31 N.W.2d 332 (1948) (injury); Heitman v. Lake City, 225 Minn. 117, 30 N.W.2d 18 (1947) (death); Ranum v. Swenson, 220 Minn. 170, 19 N.W.2d 327 (1945) (injury)
 Trial and appellate courts may consider it as well. Dawydowycz v. Quady, --- Minn. ---, 220 N.W.2d 478 (1974) (injury); Stenzel v. Bach, 295 Minn. 257, 203 N.W.2d 819 (1973) (injury); DeWitt v. Schuhbauer, 287 Minn. 279, 177 N.W.2d 790 (1970) (injury); Mester v. Fritze, 265 Minn. 242, 121 N.W.2d 335 (1963) (injury); Seitzer v. Halverson, 231 Minn. 230, 42 N.W.2d 635 (1950) (injury); Aasen v. Aasen, 228 Minn. 1, 36 N.W.2d 27 (1949) (injuries); Eichten v. Central Minn. Coop. Power Ass'n, 224 Minn. 180, 28 N.W.2d 862 (1947) (injuries); Bergstrom v. Frank, 213 Minn. 9, 4 N.W.2d 620 (1942) (death); Hain v. United States, 219 F.Supp. 257 (D.Minn.1963) (Federal Tort Claims Act injury action); McCormick v. United States, 159 F.Supp. 920 (D.Minn.1958) (FTCA injury).
 
 
 [14]
 Perry v. Allegheny Airlines, Inc., 489 F.2d 1349 (2d Cir. 1974) (diversity death action applying Conn. law); Willmore v. Hertz Corp., 437 F.2d 357 (6th Cir. 1971) (diversity injury case applying Mich. law); Southern Pac. Co. v. Zehnle, 163 F.2d 453 (9th Cir. 1947) (death case applying Cal. law); Scruggs v. Chesapeake & O. Ry., 320 F.Supp. 1248 (W.D.Va.1970) (diversity death case); See Mills v. Tucker, 499 F.2d 866 (9th Cir. 1974) (FTCA injury action applying Mich. law); Pierce v. New York C. R.R., 304 F.Supp. 44 (W.D.Mich.), On remand from 409 F.2d 1392 (6th Cir. 1969) (diversity injury case applying Mich. law); Gowdy v. United States, 271 F.Supp. 733 (W.D.Mich.1967), Rev'd on other grounds, 412 F.2d 525 (6th Cir.), Cert. denied, 396 U.S. 960, 90 S.Ct. 437, 24 L.Ed.2d 425 (1969) (FTCA injury action applying Mich. law); Armentrout v. Virginia Ry., 72 F.Supp. 997 (S.D.W.Va.1947) (diversity injury action applying W.Va. law); Cf. United States v. Furumizo, 381 F.2d 965 (9th Cir. 1967) (FTCA death case applying Haw. law); Golden v. Sommers, 56 F.R.D. 3 (M.D.Pa.1972) (diversity injury action applying Pa. law); Vaughan v. Southern Bakeries Co., 247 F.Supp. 782 (D.S.C.1965) (diversity injury action applying W.Va. law); Washington & R. R.R. v. La Fourcade, 48 App.D.C. 364 (Sup.Ct.D.C.1919) (injury)
 
 
 [15]
 Hoffman v. Sterling Drug, Inc., 485 F.2d 132 (3d Cir. 1973) (diversity injury case applying Pa. law but rejecting economist's testimony as to future inflation because it was unsupported by facts proving the probability or magnitude of inflation, without discussing Pa. law), Citing Magill v. Westinghouse Elect. Corp., 464 F.2d 294 (3d Cir. 1972) (diversity death case applying Pa. law but rejecting jury consideration of earnings increase factor, without discussing Pa. law); See Murphy v. Eaton, Yale & Towne, Inc., 444 F.2d 317 (6th Cir. 1971) (diversity injury action applying Mich. law); Williams v. United States, 435 F.2d 804 (1st Cir. 1970) (FTCA death case applying R.I. law)
 
 
 [16]
 Johnson v. Penrod Drilling Co., 510 F.2d 234 (5th Cir. 1975) (en banc) (Jones Act injury case overruling prior Fifth Circuit cases to the contrary); Bach v. Penn Central Transportation Co., 502 F.2d 1117 (6th Cir. 1974) (FELA death case rejecting expert testimony but allowing instruction permitting the jury to consider future increases or decreases in the purchasing power of money); Yodice v. Koninklijke Ned. Stoom. Maat., 443 F.2d 76 (2d Cir. 1971), Cert. denied, 411 U.S. 933, 93 S.Ct. 1902, 36 L.Ed.2d 393 (1973) (longshoreman's injury action); Sleeman v. Chesapeake & O. Ry., 414 F.2d 305 (6th Cir. 1969) (FELA injury action); See Blue v. Western Ry. of A., 469 F.2d 487 (5th Cir. 1972) (FELA injury action). But see Beanland v. Chicago, R.I. & P. R.R., 480 F.2d 109, 117 (8th Cir. 1973) (Bright, J., concurring) (FELA injury action). See also Petition of United States Steel Corp., 436 F.2d 1256 (6th Cir. 1970), Cert. denied sub nom., Lamp v. United States Steel Corp., 402 U.S. 987, 91 S.Ct. 1649, 29 L.Ed.2d 153 (1971) (seaman's death and injury action)
 
 
 [17]
 In Bach, a FELA death case, the district court excluded testimony by an economist estimating the loss in future income resulting from a railroad fireman's death. The economist was prepared to testify that due to future inflation the decedent's annual income ($13,496 at death) would have risen to $49,413 in the year 2002. 502 F.2d at 1122
 
 
 [18]
 Minn.Stat. § 176.061, subdivisions 3, 5 (Supp.1973)
 
 
 [19]
 Minn.Stat. § 176.031 (1971) provides in pertinent part:
 The liability of an employer prescribed by this chapter is exclusive and in the place of any other liability to such employe, his personal representative, surviving spouse, parent, and child, defendant, next of kin, or other person entitled to recover damages on account of such injury or death.
 
 
 [20]
 Followed in Aydt v. Union Wire Rope Co., 493 F.2d 1068 (8th Cir. 1974)
 
 
 [21]
 Minn. Stat. § 176.061, subdivision 1 (1971), before it was struck down, purported to eliminate an employer's obligation to reimburse or hold a third party harmless for judgments or settlements obtained by an employee who accepted compensation absent a pre-injury written agreement to do so
 
 
 [22]
 Minn.Stat. § 601.01, subdivision 1 (Supp.1973) reduces a plaintiff's recovery in proportion to his degree of contributory fault and precludes his recovery if his contributory negligence exceeds the defendant's negligence. See generally Marier v. Memorial Rescue Service, Inc., 296 Minn. 242, 207 N.W.2d 706 (1973)