UNITED STATES, Appellee,

v.

**Sergeant Johann ZUKRIGL, SSN 112–48–7487, United States Army, Appellant.**

CM 441688.

U. S. Army Court of Military Review.

11 March 1983.

Captain Paul J. Moriarty, JAGC, argued the cause for the appellant. With him on the brief were Colonel William G. Eckhardt, JAGC, Colonel Edward S. Adamkewicz, Jr., JAGC, Lieutenant Colonel R. Rex Brookshire, II, JAGC, and Captain David M. England, JAGC.

Captain Jessica A. Polley, JAGC, argued the cause for the appellee. With her on the brief were Colonel R.R. Boller, JAGC, Lieutenant Colonel John T. Edwards, JAGC, and Major Thomas M. Curtis, JAGC.

Before O'DONNELL, FOREMAN and WERNER, Appellate Military Judges.

OPINION OF THE COURT

O'DONNELL, Senior Judge:

The appellant was convicted of negligent homicide in violation of Article 134 of the Uniform Code of Military Justice, 10 U.S.C. § 934 (1976).[1] His sentence to a bad-con-

---

1. The specification provides pertinently that the appellant unlawfully killed Private Edward McCoy by negligently failing to observe proper safety procedures during a river crossing, by rope, to wit: the wearing of a life vest by Private McCoy; the attachment of a safety

duct discharge and reduction to the lowest enlisted grade was approved by the convening authority.

The charges in this case arose out of a drowning which occurred during a training exercise at Fort Hood, Texas. On Saturday, the ninth of May 1981, the appellant, who was a squad leader in an engineer company, suggested to his platoon sergeant, Staff Sergeant Matilde Almendarez, that the platoon participate in rope bridge training. The two of them obtained approval from their company commander. On the following Monday, the day the training was scheduled, Sergeant Almendarez had another commitment and placed the appellant in charge of the training. Sergeant Almendarez subsequently arrived at the site, but the appellant remained in charge.

The exercise was to consist of setting up three types of rope bridges over Cowhouse Creek, which was approximately sixty meters wide at the crossing site. A squad from another platoon, under the control of Sergeant Hershel Chadbourne, was also scheduled to participate in the training.

After the troops arrived at the site, a single rope was strung across the creek and secured to a tree on each shore. Each person participating in the training was to cross the creek on the rope. To accomplish the crossing, a snatch block is secured to the rope.[2] A D-ring or metal clip is hooked to a double length of rope attached to the snatch block and also to a "Swiss seat," which is a length of rope tied around the waist and between the legs of the traverser. The person then pulls himself across the water on the rope. On the day in question, Sergeant Chadbourne placed the snatch block

on the line, closed the clamp and lashed the block with a length of rope.

After the single rope was strung, the appellant made the first crossing. He was wearing a life vest and had a "tag line" attached to him. The other end of the line was attached to the main rope. Two men in a boat followed him across the creek. The same procedure was followed when Sergeant Chadbourne crossed. Private Price was the third person to cross. He had a Swiss seat, life vest and tag line. This time the tag line was affixed to Price with the other end held by somebody on the shore. Because the line was too short, it was necessary to tie it to another length of rope. After Price had traversed the creek, the tag line was removed and Sergeant Chadbourne left to obtain a longer rope.

The next person to attempt the crossing was the victim, Private Edward McCoy. The appellant assisted McCoy in putting on the Swiss seat, checked the snatch block and attached the D-ring. McCoy was not wearing a life vest.[3] Nor was a tag line attached to him. Sergeant Chadbourne had not returned with the longer rope when McCoy began the crossing.

When McCoy reached the mid-point of the crossing, the appellant, who stood on the near shore, began to shake the rope. As a result, McCoy bounced up and down three to four feet. He looked scared and said, "Stop shaking the rope." Sergeant Robertson noticed that McCoy did not have a life vest or a tag line and told the appellant to stop shaking the rope. At this time, McCoy went across the top of the rope and fell into the water. He bobbed to the sur-

line to Private McCoy; and, the close presence of a rescue boat to Private McCoy as he crossed the rope bridge, which resulted in the drowning of the said Private E–2 Edward McCoy.

2. A snatch block is a pulley device that opens on one side so a rope can pass through it. The block has a clamp which secures the opening.

3. Sergeant Tommy Robertson, a member of the platoon who was helping with the crossing, testified to this effect. In a pretrial statement introduced at trial, the appellant stated that he could not remember whether McCoy was wear-

ing a life vest. He stated further that at the time he thought McCoy was wearing the vest. According to the appellant, McCoy originally had a life vest on over his field jacket. Because the field jacket was too bulky, the appellant had McCoy remove it. The appellant believed that McCoy replaced the vest when he removed the field jacket. McCoy was not wearing the life vest when his body was recovered from the creek. We are convinced that McCoy was not wearing the life jacket when he attempted the crossing.

face one time and sank again. Rescue efforts were unsuccessful. The creek at this spot was eighteen to twenty feet deep. When the body was recovered an hour later, the Swiss seat and the D-ring were still attached. He had a slight bruise over his forehead. The snatch block was not attached and was never recovered. The boat did not follow McCoy across as Sergeant Chadbourne had directed the personnel in the boat to return to shore to get another D-ring.[4] The boat was about twenty-five meters from McCoy when he fell. (The appellant in his statement estimated the distance to be seven feet.) It took the boatmen about four minutes to turn around and reach the spot where McCoy fell in.

The appellant's version of the incident is contained in his pretrial statement which was received in evidence. He stated, "When [McCoy] got out where his ass was near the water I pulled on the rope to get his ass wet." He then let go of the rope and told McCoy to keep going. However, others on the far shore were also pulling the rope. He yelled at them to stop so that McCoy could continue. At that point, McCoy fell into the water.[5]

The appellant stated that the safety requirements for river crossings include a rubber raft, a life vest and a safety rope. When asked, by the interrogator, why he permitted McCoy to cross without a safety rope, he replied that he did not know. Later in his statement, he contended that a safety rope is used only to pull the block back after completion of the crossing and is not attached to the traverser. He did not feel that the absence of a safety rope amounted to carelessness as the pertinent training manual provides that its use is optional.

There is conflicting testimony concerning the use and function of the tag line. Sergeant Kenneth Drew, a defense witness who had participated in five river crossings, testified that the safety line is used to

retrieve the snatch block after the crossing. (He also stated that in his experience life vests are used only when the traverser is unable to swim. Evidence was introduced to the effect that McCoy had earned a life guard certificate.) On the other hand, Sergeant Chadbourne testified that a tag line is required for a crossing. According to him, it is supposed to be hooked to the traverser so that he can be pulled to shore if he falls in. Sergeant Chadbourne admitted, however, that he had observed river crossings where life vests and safety lines were not used and where boats were not in close proximity to the person crossing.

■ "Negligent homicide is the unlawful killing of another which is the result of simple negligence." *United States v. Romero,* 1 M.J. 227, 229 (CMA 1975) (footnote omitted). Simple negligence is

> the absence of due care, that is, an act or omission of a person who is under a duty to use due care which exhibits a lack of that degree of care for the safety of others which a reasonably prudent man would have exercised under the same or similar circumstances.

Manual for Courts-Martial, United States, 1969 (Revised edition), paragraph 213*f*(12), *quoted with approval in United States v. Romero, supra.* Not only must the person be negligent, but his negligence must have been a proximate cause of the death, i.e., a contributing cause that played "a material role in the victim's decease." *United States v. Romero,* 1 M.J. at 230.

■ In the instant case, we are confronted with a river crossing exercise, which is an inherently dangerous activity. As the person in charge, the appellant had a duty to take adequate measures to protect the persons under his charge from harm. Although the record contains no evidence, other than the appellant's statement, as to what safety measures were required by training manuals, standing operating proce-

---

4. Private First Class David Shellman, one of the occupants of the boat, testified to this effect. Sergeant Chadbourne testified that he did not recall issuing such an order.

5. Sergeant Chadbourne testified that in his experience rope shaking has been done to instill confidence in the troops.

dures or other directives, we are convinced under the circumstances of this case that a reasonably prudent person in the appellant's position would have assured that persons crossing the creek were wearing life vests and secured to a tag line and that a boat was following the traverser. The appellant's failure to take these measures constituted negligence. A reasonable person could have foreseen that a soldier proceeding across a creek by means of a snatch block attached to a rope could by a variety of means fall into the water and require assistance. The failure to employ these measures under the circumstances played a material role in McCoy's death and therefore was a proximate cause of Private McCoy's death.

The appellant contends, however, that the separation of the snatch block was an intervening cause which absolves him of criminal liability. We disagree. An intervening cause is

> an independent cause which intervenes between the original wrongful act or omission and the injury, turns aside the natural sequence of events, and produces a result which would not otherwise have followed and which could not have been reasonably anticipated.

*United States v. King,* 4 M.J. 785, 788 (N.C.M.R.1977), *aff'd,* 7 M.J. 207 (C.M.A. 1979) (summary disposition). *See* Perkins, *Criminal Law* 614 (1957).

The snatch block separated because the appellant, and perhaps others, pulled and jerked the rope with enough force to flip Private McCoy over it. Not only was the separation reasonably foreseeable under the circumstances, but an intervening cause must be the act or omission of an independent agency, not that of the accused himself. *See Johnson v. Serra,* 521 F.2d 1289 (8th Cir.1975); *Horstein v. General Motors Corporation,* 391 F.Supp. 1274 (S.D.N.Y. 1975). Accordingly, we hold that the separation of the snatch block was not an intervening cause.

The other errors assigned by the appellant have been considered and determined adversely to him.

The findings of guilty and the sentence are affirmed.

Judge FOREMAN and Judge WERNER concur.