Dennis L. RIHA, Appellee,

v.

JASPER BLACKBURN CORP.,
Appellant.

No. 74–1795.

United States Court of Appeals,
Eighth Circuit.

Submitted March 13, 1975.

Decided May 19, 1975.

Rehearing Denied June 11, 1975.

---

5. 392 F.Supp. 628.

J. Arthur Curtiss, Lincoln, Neb., for appellant.

Bryce Bartu, Seward, Neb., for appellee.

Before CLARK, Associate Justice,[*] and LAY and BRIGHT, Circuit Judges.

LAY, Circuit Judge.

Dennis Riha received a $460,500 jury verdict in this personal injury action against the Jasper Blackburn Corporation, a company which manufactures and markets electrical equipment. On appeal from the district court's denial of a judgment n. o. v. the defendant raises two basic issues: (1) whether the evidence was sufficient to submit the issue of strict liability to the jury, and (2) whether the trial court erred in allowing expert testimony on the projected rate of inflation and its effect on the plaintiff's future earning capacity. We affirm the judgment of liability, but find the trial court erred in allowing the jury to consider testimony concerning the rate of inflation. We order a remittitur or in the alternative a new trial.

On July 10, 1968, Riha, then 25 years old and employed as an electrician by Eschliman's Electric of David City, Nebraska, was sent by his employer to an outlying farm to install an electrical transmission line for an irrigation pump. This job required the stringing of 500 to 600 feet of aluminum wire between a meter pole (the electricity source) and the well pump. The wire had to be strung over a series of three 30-foot wooden poles and attached to a fourth pole, the meter pole, which was also 30 feet tall. Beginning with the pole nearest the pump, Riha climbed the first three poles and successfully attached the wire to each pole by means of a wedge clamp, a device used to secure wire to electrical poles. On one end, it has a clamp or wedge capable of gripping the electrical wire securely. On the other, it has a wire loop or bail which can be opened, affixed to the pole, and closed by inserting one end (the button end) in a keyhole slot on the side of the wedge. When he came to the meter pole, Riha's helper[1] placed a 30-foot wooden extension ladder against the pole, and Riha climbed the ladder and secured the end of the electrical wire to the pole, again using a wedge clamp. He then descended to retrieve more equipment, climbed back up to the second rung from the top, turned, leaned back against the ladder and began to strip the insulation coating from the end of the wire he had just attached. Suddenly the clamp released, caught his shirt, and threw him from the ladder. He landed some 16 feet from the base of the meter pole. He suffered severe and permanent injuries, including a concussion and a broken hip.

The controversy in this case centers around the reason the wedge clamp released. Riha contends that a defect in the clamp allowed it to straighten and slip from its keyhole slot. The defendant argues that it is at least as likely that the plaintiff failed to properly seat the wire in the keyhole slot.

The plaintiff offered no specific evidence of a defect. He testified to the procedure he used to attach the clamp to the pole. He said that after securing it in the normal fashion, he tested it by vigorously shaking the guy wire supporting the pole. He also said that after being thrown to the ground, he retained consciousness and was able to observe the wedge clamp, which had landed right next to him. He noticed that the bail was straightened out, as was the short

---

[*] Associate Justice TOM C. CLARK, United States Supreme Court, Retired, sitting by designation.

1. Riha's helper was Richard Eschliman, the father of Riha's employer Art Eschliman. Richard Eschliman died before trial and his testimony was not obtained.

90° bend just before the button which had been seated in the keyhole in the body of the clamp.[2]

Ray Riha, the plaintiff's brother, and Art Eschliman, Riha's employer, both observed the clamp after the accident and found it to be in substantially the condition described by the plaintiff. The plaintiff's final witness, David Cooksey, the manager of financial services of ITT Blackburn Company, the successor to Jasper Blackburn Corporation, testified by sworn interrogatory that the model of wedge clamp involved was not tested after production, though quality control inspections were conducted during production.

In Kohler v. Ford Motor Co., 187 Neb. 428, 191 N.W.2d 601 (1971), Nebraska adopted the doctrine of strict liability in products cases. The Nebraska court recognized that the existence of a defect in the product can be proven by circumstantial evidence. When the sufficiency of circumstantial evidence is challenged, the test to be applied by a reviewing court is whether, viewing all the plaintiff's evidence as credible, the conclusion reached by the trier of fact was within the range of reasonable probabilities provided by the evidence. Powers v. Wong, 477 F.2d 116 (8th Cir. 1973).

In the present case, the defendant urges that it is as likely that the plaintiff did not properly seat the wire bail in the clamp as it is that the clamp gave way. However, this argument overlooks the plaintiff's testimony, to which we must give credence, that he observed and tested what he did and that he in fact properly placed the wire bail within the keyhole slot of the clamp. It also overlooks the testimony of two other witnesses that the clamp was bent and straightened out after the failure. This presented substantial evidence of a defect which the jury was entitled to believe or disregard. If this evidence is believed there exists no explanation for the failure of the clamp other than a defect, cf. Franks v. National Dairy Products Corp., 414 F.2d 682 (5th Cir. 1969), a theory defendant's experts conceded to be a "possibility." We find there was sufficient evidence to submit the case to the jury. See also Lindsay v. McDonnell Douglas Aircraft Corp., 460 F.2d 631 (8th Cir. 1972).

We come now to the more difficult question of whether the trial court erred in permitting the testimony of an expert witness on the rate of inflation over the period of the plaintiff's projected work expectancy.

The plaintiff offered the testimony of Dr. Keith Turner, an associate professor of economics at the University of Nebraska. Dr. Turner testified to the general trend of inflation in the United States and to the possibility of its continuance. On the question of wage inflation in particular, he testified that in 1947, according to the Bureau of Labor Statistics, the average non-supervisory worker earned $45.58 a week, but that by 1972 the average had risen to $135.00 per week. He had prepared a chart showing future earnings for a 25-year-old electrician of good health with two years of high school, a life expectancy of 45.8 years and a work life expectancy of 37 years. He based his chart on the assumption that Riha would have become an electrical contractor and the standard charge of $6.50 per hour for electrical service calls during 1974 in the David City area, and the rate of average wage inflation since 1947 (4.4%). It showed a projected 1974 salary of $13,-000.00. Then he testified that between 1969 and 1973, electricians in this region experienced an increase of 7% per annum. Using this rate of increase he calculated Riha's total future earnings if he had continued as an electrician to be $1,337,000.00. He likewise predicted that based on Riha's five tax returns as a farmer (without any similar discussion of the increase in farm income) and the 4.4% wage inflation rate applicable to non-supervisory workers, he would earn

2. The actual clamp involved could not be found and was not introduced into evidence.

$244,901.00 as a farmer during the same period.

Plaintiff's counsel argued from this testimony that Mr. Riha would suffer a loss of income before taxes of $1,092,-000.00, which commuted at 5% to a present value of $539,363.00.

The defendant challenges the admission of expert testimony on the question of inflation. The admissibility of expert testimony concerning inflation and its effect on future values is a question of first impression in this circuit. We are reluctant to interfere with the trial court's discretion in determining the necessity for and admissibility of expert opinion evidence. Nonetheless we are bound by our interpretation of the Nebraska rule on damages.

■ The measure of damages in Nebraska for personal injury resulting in permanent disability is that amount which will compensate the plaintiff for the diminution of his earning capacity reduced to its *present* value. Lake v. Southwick, 188 Neb. 533, 198 N.W.2d 319 (1972); Borcherding v. Eklund, 156 Neb. 196, 55 N.W.2d 643 (1952). The Nebraska Supreme Court has considered the place of inflationary considerations in this measure of damages. In Johnson v. Schrepf, 154 Neb. 317, 47 N.W.2d 853 (1951), it observed:

> Economic condition, including the low purchasing power of money for the necessities of life, is a factor in determining the amount of a verdict.

. . . The period of inflation *now* existing is a factor which the jury could consider in arriving at the amount of the verdict. We must assume that the jury gave consideration to this fact, as it had a right to do. (Emphasis added.)

47 N.W.2d at 858.

*See also* Borcherding v. Eklund, *supra*, 55 N.W.2d at 650–51.

Notwithstanding the fact that jurors may consider inflation as a general factor, however, the Nebraska court has held that an instruction on future inflation is improper. In Segebart v. Gregory, 160 Neb. 64, 69 N.W.2d 315 (1955), the court said:

> The value of money is a representative one. It is fixed by the value of the thing or things for which it can be exchanged. *Whether that value has depreciated or appreciated with reference to some other period is not material.* The value of money, i. e., its purchasing power, is elemental within the knowledge and experience of men generally. It is one of the facts of life which jurors are presumed to know. (Emphasis added.)[3]

69 N.W.2d at 318.

*See also* Shields v. County of Buffalo, 161 Neb. 34, 71 N.W.2d 701 (1955).

■ We believe the Nebraska Supreme Court would also prohibit direct testimony on inflation over a person's life or work expectancy.[4]

---

**3.** It is interesting to note that the holding in *Segebart* that inflation is not a proper subject for instruction is based on a 1933 Wisconsin decision which was concerned with the *greater* purchasing power of the dollar existing at that time. In Rebholz v. Wettengel, 211 Wis. 285, 248 N.W. 109 (1933), the court noted:

> The evidence well warrants the jury's assessment of damages, regardless of the present greatly increased purchasing power of the dollar, as to which Wettengel sought, by a requested instruction, to have the jury's attention specifically directed. The present greater purchasing power of the dollar, and the correspondingly low values of property, are matters of common knowledge to such an extent, and because of the general economic distress which has followed, have be-

come impressed so deeply in the minds of all adults that there is no need for expressly instructing a jury to take those matters into consideration in assessing damages.

*Id.* at 111.

**4.** There are of course many deficiencies in our present system for awarding money damages for future loss. *See* Schreiber, Damages in Personal Injury and Wrongful Death Cases (Practising Law Institute, 1965). In the first place, there exists no certainty of continued loss—an individual might die or in later years enter another vocation earning more money. To attain a more exact method of compensation we could have open-end judgments whereby damages would be assessed anew on an annual basis. In this manner taxes, inflation or deflation and the certainty of mitigated

Courts have been somewhat divided within both the federal and state systems on the admissibility of an economist's testimony concerning the effect of future inflation on the purchasing power of the dollar. The two leading decisions excluding such evidence are found in Judge Friendly's noted opinion in McWeeney v. New York, N. H. & H. R. R. Co., 282 F.2d 34 (2d Cir.), cert. denied, 364 U.S. 870, 81 S.Ct. 115, 5 L.Ed.2d 93 (1960), and in the Sixth Circuit's opinion in Sleeman v. Chesapeake & Ohio Ry. Co., 414 F.2d 305 (6th Cir. 1969). Recently the Fifth Circuit also excluded evidence on inflation and the absence of income tax applicable to the award in Johnson v. Penrod Drilling Co., 510 F.2d 234 (5th Cir. 1975) (en banc). On the other hand, some states such as Iowa in our own circuit have admitted such evidence as proper for a jury to consider along with all of the evidence affecting the future earning capacity of an injured person. *See* Schnebly v. Baker, 217 N.W.2d 708, 726–28 (Iowa 1974). Many commentators urge that approach. *Cf.* Henderson, Some Recent Decisions on Damages; With Special Reference to Questions of Inflation and Income Taxes, Ins.Coun.J. 423 (July 1973); Peck &

Hopkins, Economics and Impaired Earning Capacity in Personal Injury Cases, 44 Wash.L.Rev. 351 (1969); Comment, Damages for Loss of Future Income: Accounting for Inflation, 6 U. of San Francisco L.Rev. 311 (1972). The *Sleeman* case has been weakened by the Sixth Circuit's later observation that the reference to the exclusion of evidence of future inflation there was mere dictum. (*See* Willmore v. Hertz Corp., 437 F.2d 357 (6th Cir. 1971), wherein that court permitted such evidence to be considered by a jury under Michigan law.) The *Sleeman* case is additionally weakened by the Sixth Circuit's latest opinion in a case involving an action under the Federal Employer's Liability Act where that court, without mentioning *Sleeman*, observed:

In recent history inflation has been so persistent that it is difficult to conceive that the purchasing power of the dollar might remain constant through the year 2000. On the other hand, the predictive abilities of economists have not advanced so far that they can forecast with any certainty the existence and rate of inflation for the next thirty years. Limited use of economists and other experts may be appro-

loss could be more accurately measured. Yet it should be obvious that such a system would be unmanageable and would serve few interests. *See* Frankel v. United States, 321 F.Supp. 1331, 1340–41 (E.D.Pa.1970). Therefore the law must recognize compensation in terms of approximate damages based upon proof of loss demonstrated with a reasonable degree of certainty. If the present value of the dollar is diminished in purchasing power, this fact may be considered by a jury and may justify as well a court rejecting comparisons of past awards for similar injuries when considering excessiveness of an award.

However, where the evidence focuses upon possible future inflation affecting future loss, projected over a person's life expectancy, it would appear inadmissible not only because it is speculative and uncertain, but because it opens up a myriad of collateral and remote considerations.

Proof as to possible income tax, future inflation, attorney fees and cost of litigation are all generally held inadmissible. Yet it cannot be denied that all of these elements relate directly or indirectly to the computation of an injured party's actual loss. Once the door is opened

to one contingency, it is necessary to consider as well all other factors which might affect actual loss. The primary reason for their exclusion is that they are not in a manageable form of proof. For example, assuming a defendant in a personal injury action is allowed to show to the jury that an award is not subject to income tax, what tax rate should the jury consider in reducing plaintiff's award? *Cf.* McWeeney v. New York, N. H. & H. R. R. Co., 282 F.2d 34 (2d Cir.), cert. denied, 364 U.S. 870, 81 S.Ct. 115, 5 L.Ed.2d 93 (1960). There are, of course, many variables which might affect a person's tax rate from one year to another. Similarly, in allowing a jury to consider possible future inflation rates, the defendant would have the right to show by other experts that in inflationary times there would be a corresponding increase in interest rates affecting investments and thereby raise the discount rate to be considered in computing present value. Instead of assisting jurors to render a verdict of reasonable compensation, collateral considerations of income tax and inflation will inject into trials confusing and conjectural mathematics and assumptions and as well will create unmanageable trials.

priate in some cases to show that raises in income or promotions would most probably occur. . . . Yet testimony on the exact income that the decedent would have received through the year 2002 is so speculative, in our view, that it is inadmissible.

We do not hold, however, that the jury may never consider inflation and future increases in income in determining damages. Ideally, the damage award should compensate appellant for the financial loss she will suffer as a result of the death of her husband. If a jury is not permitted to consider decreases in the purchasing power of money, appellant would be woefully damaged if inflation should continue at its present or at any other substantial rate. Some consideration of probabilities is inevitable in any fair award of damages. The court's role is to keep such extrapolations within reasonable bounds and insure that they conform to the evidence. Har-Pen Truck Lines, Inc. v. Mills, 378 F.2d 705, 709–710 (5th Cir. 1967).

Even though no expert testimony on inflation and future increases was admitted, it was still error for the district court to charge the jury that it should not consider "future increases or decreases in the purchasing power of money." Cf. Willmore v. Hertz Corporation, 437 F.2d 357 (6th Cir. 1971). Inflation is a fact of life within the common experience of all jurors. Admittedly, if the jury considers this issue without expert testimony, their calculations will be even more imprecise. There is always a chance that the verdict may be too generous. But if jurors should be prohibited from

applying their common knowledge of inflation in reaching a verdict, the party entitled to recovery could be grievously under-compensated. The court can always rectify an exorbitant verdict through its power of remittitur. See 6A Moore's Federal Practice ¶ 59.-05[3].

Bach v. Penn Central Transportation Co., 502 F.2d 1117, 1122 (6th Cir. 1974).[5]

We find this view more accurately reflects both the federal and Nebraska rule.

Thus, even under the Sixth Circuit's more liberal observation in Bach, the evidence of future inflation projected out in the present case over the plaintiff's lifetime to the year 2005 was speculative and inadmissible.

■ In addition to the error in projecting out the inflationary increases, the defendant contends Dr. Turner's testimony was also erroneously premised on the assumption that the plaintiff's wages as an electrician in 1974 would have been $6.50 an hour. We agree. This evidence in regard to $6.50 was what a David City electrician would charge a customer for an employee's work. This figure does not take into account the overhead costs (equipment, depreciation, workmen's compensation, etc.) and profit an employer would expect from such a rate. This was not broken down into the actual wage paid an employee. Thus the fundamental assumption upon which the economist's testimony was based was in error as well.

We hold that the award was excessive for the reasons stated. In the interest of judicial economy we think plaintiff should be given the option of filing a remittitur, or in the alternative retrying

---

5. We note as well that Judge Friendly recently observed in Yodice v. Koninklijke Nederlandsche Stoom. Maat., 443 F.2d 76 (2d Cir. 1971):

While if inflation should continue at its present pace, courts may have to reconsider the propriety of the long recognized charge with respect to discount, cf. McWeeney v. New York, N. H. & H. R. R., 282 F.2d 34, 38 (2 Cir.), cert. denied, 364 U.S. 870, 81 S.Ct. 115, 5 L.Ed.2d 93 . . . , they have elected not yet to do so, Sleeman v. Chesapeake & Ohio Ry., 414 F.2d 305, 307–308 (6 Cir. 1969). With the complete absence of economic data in the present record and the relatively small loss of future earnings that is even claimed, it is difficult to imagine a case which would be a more inappropriate vehicle for that purpose.

443 F.2d at 79.

the damage question only in a new trial. We thus vacate the judgment with directions that the district court grant a remittitur in such sum as the court deems reasonable and enter a judgment in a sum which fairly and reasonably compensates the plaintiff under the principles of damage discussed herein. We prefer the district court to grant the remittitur and reinstate a verdict award since it has had a better opportunity to observe the witnesses and assess the credibility of the plaintiff and the medical experts first-hand. The trial court shall award such a remittitur or in the alternative upon the plaintiff's refusal to accept the remittitur grant a new trial on the question of damages only.

The judgment fixing liability of the defendant is affirmed; the money judgment is vacated and remanded to the district court with directions to grant a remittitur, or at the plaintiff's election in the alternative to grant a new trial on damages only.