**Glen Dale STECKLER and Annette Steckler, Plaintiffs-Appellants,**

v.

**UNITED STATES of America, Defendant-Appellee.**

**No. 76–1141.**

United States Court of Appeals, Tenth Circuit.

Argued and Submitted Jan. 26, 1977.

Decided Feb. 25, 1977.

Kenneth N. Kripke, Denver, Colo., for plaintiffs-appellants.

Richard J. Spelts, First Asst. U. S. Atty., Denver, Colo. (James L. Treece, U. S. Atty., and David T. Fisher, Asst. U. S. Atty., Denver, Colo., on the brief), for defendant-appellee.

Before McWILLIAMS, BARRETT and DOYLE, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

In this Federal Tort Claims action, the appellants sought and obtained a favorable court awarded judgment based on the medical malpractice of the Veterans Administration Hospital at Denver. The claim was that the V.A. staff neglected to recognize and treat a lack of blood circulation in the legs of plaintiff Glen Steckler. The theory at trial was that this misdiagnosis resulted in amputation of Steckler's left leg above the knee and resulted as well in damage to his right leg. The trial court awarded judgment to Glen Steckler in the amount of $58,756.17 which included loss of present and future earnings, present and future pain and suffering together with permanent disability. Glen's wife, Annette Steckler, was given $10,000.00 for loss of companionship, services, etc. Colorado, an intervenor, was awarded the sum of $5,193.28 for medical expenses incurred by it through the Medicaid program. In this appeal Steckler seeks reversal of the damage award only. He claims that the amounts are so insufficient as to be clearly erroneous.

The incident which brought about Steckler's troubles was an automobile collision which occurred March 30, 1972. Steckler drove his pick-up truck into the rear of a vehicle which was being driven in front of his truck. His abdomen struck the steering wheel and he later complained of numbness in his legs. He was taken by his wife to the Veterans Hospital. There he was assigned to the psychiatric ward notwithstanding that he complained that he was unable to move his legs and that they were numb. Although he remained in the hospital for more than two weeks, little was done to determine the cause of his complaints concerning his legs.

Following his release he consulted a private physician who attempted to treat him. He was referred to another doctor who diagnosed his condition as an aortic occlusion. He called in a cardiovascular surgeon. Surgery was carried out in order to restore the circulation. This helped the right leg but not the left. Gangrene set in making amputation of the left leg necessary.

The trial court found that the negligence of the Veterans Administration Hospital was in failing to diagnose and treat, together with delay in securing the ultimate diagnosis, all of which produced the ultimate injuries to Steckler's legs.

Steckler was shown to have been 39 years of age at the time of trial. He was 35 years of age at the time of the accident. He had had an eighth grade education. He served three years in military service and was honorably discharged. He had held many different jobs most of which were in the construction industry. Through the years he had worked as a laborer or as a heavy equipment operator. During the period from 1968 to 1971 his gross annual earnings fluctuated from $5,249 to $7,502.

Steckler testified that his health and work history were excellent. He said that he could remember only two times when illness caused him to miss a substantial period of work. There was some conflict on this. He was shown to have four children by a former marriage and two stepchildren by his present marriage. He was shown to have been supporting the latter but not the former. The stepchildren received $160 per month in Social Security benefits.

The trial court found Steckler to be a heavy drinker of beer but not to be an alcoholic. He encountered difficulty in adjusting to the artificial leg. A defense expert said that he was capable of adjusting to the leg; that he was 50 percent disabled; and that he was capable of certain kinds of work which could be performed while he remained seated.

Steckler receives a total of $449.95 per month as Social Security and V.A. benefits.[1]

The evidence was in dispute as to the extent to which Steckler had realized physical and psychological rehabilitation. There was testimony that he was not pursuing available job opportunities. A psychologist testified that Steckler's overall adaptation in terms of vocational rehabilitation was poor and that he was unable to perform any occupation with current skills.

## I.

The contentions of plaintiffs-appellants deal entirely with the alleged inadequacy of the damages which the trial court awarded in each of the categories. Specifically it is argued:

First, that the award based on loss of past earnings was incorrect; that the court's averaging of gross income for four years preceding the accident and then multiplying by the number of months which passed from operation to the trial (forty-four months) was erroneous because the evidence showed that Steckler had illnesses for several months which unfairly decreased his gross income in the years in which he had the illnesses. They contend that the court should have used the income for 1969 amounting to $7,502 and which was higher than the average found by the court.

---

1. This is relevant because of the issue whether the collateral source doctrine applies. The trial court held that it did not.

Second, that the court erred when it failed and refused to give effect to the inflation which took place during the 44 month period in issue and which is probably to take place in the future.

Third, that it was error for the court to reduce the income for the test period by the sums received from Social Security and the Veterans Administration in the amount of $450 per month. They contend that there is no evidence as to the amount actually received during the forty-four month period. A further argument is that the collateral source rule applies to these government benefits. The trial court rejected this argument.

Fourth, the appellants appear to place the most emphasis on the refusal of the court to recognize inflationary factors in the computation of future earnings. They argue that the court failed and refused to follow the present trend of the law, and, further, that it was unfair to apply a discount factor to future earnings for the purpose of reducing so as to reflect the present value of the amount awarded and at the same time to refuse to allow the future earnings to increase because of the inflation factor.

The government, on the other hand, maintains that the court's findings are well founded and unassailable. The court calculated the loss of future earnings at 100 percent rather than at 50 percent as determined by it. Moreover, it did not use net income after taxes. The government further argues that the plaintiffs' witness, Stone, an accountant, was incompetent to compute future inflation trends and thus the court was justified in not considering his testimony. The government points to the sparse authority pertaining to consideration of the influences of inflation.

## II.

The trial court's failure to give effect to the influence of inflation on the plaintiff's earnings, past and future, is the important point in the case. Since a new trend in the law applicable to future earnings is present, it is necessary to consider the question of applicability of inflation to future earnings in some depth.

The plaintiffs' evidence on inflation and the value of future earnings was given by Mr. Marvin L. Stone, who testified as an expert on the subject of evaluation of earning capacity. Mr. Stone's experience was in the area of accountancy. He was shown to be a C.P.A. and to have served in various courts, federal and state, as an expert witness on projections of future earnings for individuals or for the purpose of projecting the stream of earnings for businesses. Defendant-appellee conducted a voir dire examination of Stone before he expressed his opinions. This questioning brought out that he was primarily an accountant with moderate academic work in economics most of which occurred as an undergraduate. He also, however, had training in college and professional development courses having to do with statistical methods.

Following the voir dire examination, counsel for appellee objected to the qualifications of Stone to make long-range predictions as to wage trends. However, the court overruled this objection on the ground that it was not certain what type of expert opinions would be presented through him. The court also said that it was not known at that point what the nature of Stone's underlying assumptions would be. All in all, the trial court was convinced that the objection went to the weight to be given to Stone's conclusions rather than to his qualifications to make them.

Stone testified that he used the 1969 earnings of Steckler for the purpose of projecting future earning capacity. However, Stone did employ Bureau of Labor statistics for the construction industry in Colorado covering the years 1969 to 1973, inclusive, for the purpose of constructing a trend of wage increases from which to project Steckler's future earning capacity. He used a weighted average approach which gives more weight to each later year of the five. The weighted gross increase factor which he determined to apply was 9.5 percent. He said that based on statistics available for the period 1900 to 1970 concerning

the rate of return on safe investments (plaintiffs' Exhibit 5), it was his conclusion that a four percent discount factor was appropriate for reduction of the future earnings awards to present value.

Stone also testified concerning projected earnings for Steckler during his lifetime (plaintiffs' Exhibit 6). This began with the base year 1969 during which the earnings were $7,502. That figure was compounded annually by the 9.5 percent factor in order to bring it up to 1972, the time of the injury. The 1972 figure was $10,169. This amount was compounded annually by the same factor for the period 1972 to 2009. The compounded figure for each of the years after the date of the trial was reduced by the four percent discount factor to bring it to present value. This did not, according to Stone, include any factor for proficiency increases or promotions. Thus the primary factor which was taken into account was the inflationary element which in this reference was the percentage by which the average construction worker in Colorado earned more each year as compared with the previous year.

Exhibit 6 was objected to by the government on the basis of Stone's competency to so project. The court overruled this pointing out that it would follow the same kind of guidance that it provided a jury regarding expert testimony and added that if the court disbelieved the reasons given in support of the conclusions of the expert, it would disregard them just as it would instruct the jury to do.

Following the trial, the court issued its findings and conclusions holding that Steckler was entitled to compensation for loss of future earnings during his 26 year working life expectancy at the rate of $6,609 per year, the average of his annual earnings for 1968–71, or a total of $171,834. Deducted from this was the sum of $140,400 consisting of Social Security and V.A. benefits in the amount of $5,400 per year for 26 years. The balance was $31,434 which when reduced to present value amounted to $19,-323.17 net, for loss of future earnings.

The court then rejected in its entirety the appellants' contention that there should be an increase in the award based on the anticipated inflation. The court's response was that there was an existing mechanism for cost-of-living increases in the Social Security benefits that Steckler would be receiving. He stated also that it was reasonable to assume that Congress would take note of inflation in granting increases in the V.A. disability benefits that Steckler would receive. The court, however, finally concluded that an award reflecting the effect of inflation on future earning capacity was improper as being too speculative.

While acknowledging a division of judicial authority on the subject, the court considered the viewpoint adopted by those courts that the inflationary effect was too complicated and speculative to predict. On this it said: "It is impossible for the court to determine what the future economic trends may be and, if inflationary, the extent thereof other than pure speculation and guesswork." Following the entry of judgment, arguments were held on the plaintiffs' motion for new trial. Plaintiffs' counsel brought to the court's attention a number of circuit court decisions in which the courts had assertedly abandoned their earlier position that an award for inflationary effects on future earning capacity was prohibited as being too speculative. These cases included the following: *Feldman v. Allegheny Airlines, Inc.*, 524 F.2d 384 (2d Cir. 1975); *Riha v. Jasper Blackburn Corp.*, 516 F.2d 840 (8th Cir. 1975); *United States v. English*, 521 F.2d 63 (9th Cir. 1975). The trial court observed that neither the United States Supreme Court nor the Tenth Circuit had spoken definitively on the subject and that it would look to the Tenth Circuit for guidance should there be an appeal.

We believe, as did the trial court, that inflation of wages particularly in the construction industry has been with us for some period of time and that there is reason to expect that it will continue. In fact some courts in recognition of this permit jurors to apply their own knowledge to the subject. *See Bach v. Penn Central*, 502

F.2d 1117, 1122 (6th Cir. 1974). Why then was the testimony of the witness Stone not considered and applied at least as a guide in determining the effect that inflation is likely to have on future earnings? It is true that the rate of inflation used by the witness Stone had the appearance of being high and it is understandable that the court would reject the 9.5 percent figure advanced by him. This, however, does not justify rejecting altogether the inflationary trend. There is merit in the appellants' argument that an inconsistency was apparent when the application of the discount percentage to the award for future earnings was allowed and the inflation adjustment was denied. The court selected a four percent discount which was certainly fair from the standpoint of the plaintiffs-appellants. But the application of a discount goes on the assumption that the future earnings will be at roughly the same rate as they were in the base period. It assumes that the value of the earnings would, if prudently invested, be augmented by four percent over the entire 26 year period.

It is noteworthy that the majority of courts hold that in calculating damages for loss of future benefits there is to be a reduction of future benefits to present value, but the effects of inflation on future benefits are not to be considered. *See, e. g., Williams v. United States*, 435 F.2d 804, 807 (1st Cir. 1970); *Sleeman v. Chesapeake & Ohio Railway Co.*, 414 F.2d 305, 307 (6th Cir. 1969). The rationale for this is that such consideration of future inflation in awarding damages is speculation. But this approach has been subjected to criticism and attack in recent years and as a result has given way to different approaches to the problem.

One approach is to abandon the reduction to present value calculation and, simultaneously, to reject consideration of future inflation. This method is based on the belief that to discount to present value without considering inflation is both unfair to persons seeking recovery and inaccurate as a formula for assessing compensation. *See Freeport Sulphur Co. v. S/S Hermosa*, 526

F.2d 300, 308–09 & n.3, 311, *rehearing en banc vacated after settlement* (5th Cir. 1976) (Wisdom, J., specially concurring); *Bach v. Penn Central Trans. Co., supra. See also* Carlson, Economic Analysis v. Courtroom Controversy: The Present Value of Future Earnings, 62 A.B.A.J. 623, 629 (1976).

Based upon its view that it was desirable to allow the discount and inflation factors to offset one another, the Supreme Court of Alaska ruled out both calculations. *See Beaulieu v. Elliott*, 434 P.2d 665 (1967). This offset approach has some support in both state and federal courts. *See Freeport Sulphur Co., supra*, at 309–11 (Wisdom, J., specially concurring); *Pierce v. New York Central Railroad Co.*, 304 F.Supp. 44 (W.D. Mich.1969); *Gowdy v. United States*, 271 F.Supp. 733 (W.D.Mich.1967); *rev'd on other grounds*, 412 F.2d 525 (6th Cir.), *cert. denied*, 396 U.S. 960, 90 S.Ct. 437, 24 L.Ed.2d 425 (1969). *See also Van Schaack & Co. v. Perkins*, 129 Colo. 567, 272 P.2d 269, 272 (1954).

A recent decision of the Ninth Circuit in *United States v. English*, 521 F.2d 63 (9th Cir. 1975), rejected this offset doctrine in an action under the Federal Tort Claims Act, but the court held that the trier of facts in awarding damages may take into consideration estimated changes in the purchasing power of money. The court favored determining future income by considering estimated changes in the purchasing power of the dollar. This method then called for discounting estimated future income to its present value. The court did not, however, authorize any arbitrary guesswork in determining future inflationary effects. It stated that the trial court should take into account only such estimates of future changes in the purchasing power of money as are based on sound and substantial economic evidence. *Id.* at 75–6. Nevertheless, the Ninth Circuit did approve the consideration of evidence of inflationary trends. It may well be that the end result will be not dissimilar to the offset approach described above. However, the Ninth Circuit rule expounded in *United States v. English, su-*

*pra,* is the preferable way because it calls for coming to grips with the inflationary trends as well as the appropriate discount rate and it should insure a more accurate and just result. *See Huddell v. Levin,* 537 F.2d 726, 743–44 (3rd Cir. 1976) (expert testimony about discount & inflation rates permitted).

A third approach, illustrated by the Eighth Circuit's opinion in *Riha v. Jasper Blackburn Corp.,* 516 F.2d 840 (1975), rejected the notion that evidence as to inflationary trends could be received and considered. It in effect adopted the position expressed in *Bach v. Penn Central Trans. Co., supra. Bach* and *Riha* permit admission of evidence on probable future raises in income or promotions. As to evidence of future inflation trends, the court held that it was too speculative. At the same time, the court approved allowing the jury to consider diminished or increased purchasing power of the dollar. It thus permits inflation to be taken into account. What it disapproves is using expert witnesses to develop outlandish results. Compare *Higginbotham v. Mobil Oil Corp.,* 545 F.2d 422 (5th Cir. 1977) (an award may be based on evidence of future wage increases that are attributable to job performance or experience, but not those attributable to inflation), a case which approves a method similar to that in *Riha* and *Bach.*

Finally, the Second Circuit in *Feldman v. Allegheny Airlines, Inc.,* 524 F.2d 384 (1975), approved use of an inflation factor to reduce the amount of the discount factor (the factor for reduction to present value). Expert testimony had been given concerning average earnings from prudent investments over a long period of time. Also, past inflation rates were permitted to be shown as evidenced by the consumer price index of the Department of Labor. This process developed a 1.27 percent difference between the investment rate and the inflation rate, and the trial court used this net figure as the inflation-adjusted discount rate. The Second Circuit approved this, at the same time noting that many courts have allowed inflation to be considered.

Judge Friendly's concurring opinion pointed out that the utilization of an inflation rate in determining the discount rate gives nearly the same result as does first considering inflationary effects on future income and then discounting estimated future income to present value. Judge Friendly was guarded in going along with the majority opinion and expressed his concern that it posed the problem of potential speculativeness in calculating damages. *See* 524 F.2d at 391–93.

█ In our opinion the best rationale is contained in the opinion of Senior Circuit Judge Barnes in the Ninth Circuit case of *United States v. English,* wherein the court objected to the offset approach of the Alaskan rule, but approved the trier of fact taking into account estimated changes in the purchasing power of money, and at the same time discounting the future income stream to its present value. The worth of this approach is found in its coming to careful grips with the inflation trends and with the problem of discounting the ultimate inflated sum (to be supported by reliable evidence) so as to reduce it to its present value.

█ On remand the court should then determine from the evidence a reasonable annual percentage figure for the purpose of accounting for probable wage inflation during the 26 year work expectancy of Steckler. In this connection we note that government counsel at trial suggested that the Bureau of Labor Statistics Reports for the 1958–72 period demonstrate an annual percentage wage increase of about six percent. The Bureau of Labor Statistics Report, covering an extended period of time, is a reliable, rough guide for the trial court's consideration of a reasonable inflation rate.

### III.

The appellants challenge the action of the trial court in ruling that amounts paid to the appellant for Social Security disability by the government and the amount paid as a veterans benefit by the government were not subject to the collateral source doctrine

and, therefore, were deductible from any judgment awarded to the plaintiff against the government. The collateral source rule is defined by the Supreme Court of Colorado in *Kistler v. Halsey*, 481 P.2d 722, 724 (S.Ct.1971), as follows:

Simply stated, it is that compensation or indemnity received by an injured party from a collateral source, wholly independent of the wrongdoer and to which he has not contributed, will not diminish the damages otherwise recoverable from the wrongdoer.

The court in that case applied the rule to compensation in the form of wages paid by an employer under an employment rule or policy providing for sick leave and accumulation thereof.

The Colorado Court of Appeals has had occasion to apply the rule in *Powell v. Brady*, 30 Colo.App. 406, 496 P.2d 328, 332 (1972). In that case the holding was "that damages recoverable for a wrong are not diminished because the injured party has been wholly or partially indemnified or compensated for his loss by insurance effected by him and to which the wrongdoer did not contribute."

This court has had occasion to consider and apply the collateral source doctrine in a case that bears some similarity to that at bar, *United States v. Gray*, 199 F.2d 239 (10th Cir. 1952) (veterans' disability benefits). There, the amount which was deducted in a Tort Claims Act case was a monthly payment of nonmilitary service connected disability.

Whatever the nomenclature, the payments to plaintiff were essentially compensation for her disability. And to compensate her in full by lump-sum judgment under the Tort Claims Act for her total and permanent disability, and in addition compensate her by monthly payments for her disability, would constitute double payment pro tanto for such disability. Any award of damages to which plaintiff is entitled under the Tort Claims Act should be diminished by the $8,640 paid her, as was done by the trial court; by the aggregate of the monthly payments of $60 already made to her; and by the present cash value of the payments to be made to her in the future. *See Gray, supra*, at 244. Since the trial court had not deducted these payments, the judgment was reversed and the cause was remanded for further proceedings.

■ There is a dearth of authority on whether Social Security disability payments are to be regarded as income from a collateral source insofar as they represent payments made by the injured person and his employer. Logically they are collateral. We do know that the government has supplemented the fund from time to time where this has been necessary. The extent to which the payments under Social Security disability can be traced to the government is questionable. The part contributed by the worker and the employers has the aspects of social insurance and as such is collateral to monies contributed by the government. However, no authorities have been presented to us on this issue and our research has failed to produce any case dealing with the subject. It may be impossible to ascertain the part or percentage of funds attributable to the government which would be deductible since the monies are commingled. Nevertheless, some effort to ascertain the percentage or part contributed by the government should be made so as to permit a determination of the contributions of the employer and employee and their exclusion as collateral sources.

Since the cause is to be remanded, this subject ought to be considered. The onus should be placed on the plaintiffs to come up with positive information if such facts are obtainable. The veterans benefit is unquestionably a non-collateral source which is deductible from an award in that it is derived entirely from government funds and cannot be claimed to originate in any collateral contribution. *See Gray, supra*, at 244.

### IV.

We at last take up the issue of inflation as it effects the damage award for loss of past earnings.

The appellants contend that there was plain error in failing to consider known inflation in setting the award of damages for loss of past earnings. The court used the same base year earning figure that it had employed in determining damages for loss of future earnings. This base figure is $6,609 being the simple average of Glen Steckler's annual gross earnings for the years 1968–71. Using that figure the court calculated lost earnings for the 44 month period from the date of the amputation to the date of the trial as $24,233 which when reduced by the amount of Social Security benefits and veterans benefits, $450 per month, brought the award down to $4,433.

 We conclude that the known inflation which existed during the period prior to trial must be considered if the judgment is to reflect with some accuracy the probable earnings of Glen Steckler during the pretrial period. There was unquestionably substantial wage inflation during the 44 month period. Plaintiffs' Exhibits 7 and 8 show significant wage inflation during the year 1973. By now government statistics for 1974 ought to be available. From these, assuming Steckler had worked the same number of hours during this period that he had worked in the earlier sample years, his earnings would have been higher due to the effects of wage inflation. Drawing from the available sources, the court can on remand apply a reasonable inflation factor to determine the amount Steckler would in all probability have earned during this period.

If the trial court should determine that a part of the Social Security disability award had a collateral source, there would have to be an adjustment on this account for the period after the amputation to the time of trial. This would be in addition to the future period. Adjustment for past earnings would follow the same pattern that is established with respect to the future earnings. Thus, if the collateral source can be established for future earning capacity it would apply also in the computation applicable to past earnings.

The judgment of the district court is reversed in part and the cause is remanded for such further proceedings as are necessary and in accordance with the foregoing opinion.