**Rosemary COATES and Marcian Coates and Adam Coates, minors, by Rosemary Coates, their mother and next friend, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**No. 83–1191.**

United States District Court, C.D. Illinois, Peoria Division.

May 6, 1985.

Gary Clark, Allen, Clark, Cullinan & Harn, Peoria, Ill., for plaintiffs.

L. Lee Smith, Asst. U.S. Atty., Peoria, Ill., for defendant.

## MEMORANDUM OPINION

MIHM, District Judge.

This is an action for damages flowing from the death on July 15, 1982 of Terry Coates, husband and father of the Plaintiffs. Suit is brought pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq, being based upon § 2674. Jurisdiction of this Court is based upon 28 U.S.C. § 1346(b) and venue is properly asserted under 28 U.S.C. § 1402(b). Colorado law applies.

## FINDINGS OF FACT

On the day Terry Coates drowned, he was camping with his wife and two children in an area of Rocky Mountain National Park known as the Aspenglen Campground. He was, on that day, 36 years of age, healthy, and employed by the Peoria Public Schools. He had begun as a teacher with the school district and had, by virtue of additional schooling and effective performance, moved up into an administrative position. The evidence showed that Terry Coates was an accomplished handyman, performing many of the routine duties of maintenance and repair around his home. In addition, he completely remodeled the family basement, doing all but the most basic plumbing in order to convert it to a family room. He also made furniture for the home. He built the patio, repaired the

family cars, and did everyday yard work and housework. He also was actively involved with his children, helping them with their school work and taking opportunities to teach them through the family's recreational activities. This latter activity included teaching the children biology while they were on camping trips.

Theirs was a family of avid campers, and in July of 1982 they planned the longest camping trip they had ever taken, going to Rocky Mountain National Park in Colorado. Upon their arrival at the camp they paid the fee, which was assessed by the United States for camping, and were assigned a location in the Aspenglen Campground.

At this point, the Court will attempt to create a word picture of that area in Rocky Mountain National Park relevant to an understanding of the events which occurred on the day of Terry Coates' death.

At the top of a steep mountainous incline is the Lawn Lake Dam (the dam), which is situated within the park but owned by the Farmers Irrigation Ditch and Reservoir Company. Near the dam and proceeding down the side of the mountain is a water channel known as the Roaring River Drainage. At the base of the Drainage there is a large, relatively flat meadow area which is known as Horseshoe Park. Although the terrain of Horseshoe Park itself is substantially flat, the elevation of the west end is higher than that of the east end so that the park is tilted downward in the direction of Aspenglen Campground. At the lower east end of Horseshoe Park is a second dam, known as Cascade Dam, which is approximately 40 feet wide and located about one-half mile from the Aspenglen Campground. The campground itself is downstream from the Cascade Dam, sitting at an elevation lower than that of Horseshoe Park. It consists of two separate areas; the first a "mainland" area consisting of a parking lot and walk-in campsites, and the second being an island of still lower elevation, connected to the mainland by a footbridge.

On the morning of July 15, 1982, the tent of Terry Coates and his family was pitched in a mainland campsite at the Aspenglen Campground. Sometime before 6:30 a.m. that morning, the Lawn Lake Dam had failed and a garbage man, observing the rushing water, notified the ranger station which served that portion of the park. The following events all occurred within a period of slightly more than one hour. Park rangers were alerted to the potentially dangerous situation and, within approximately 20 minutes of the report of the dam's failure, Ranger Schultz was dispatched to warn the "walk-in" (mainland) campsites. At 6:50, he entered the campsite and, within 15 minutes, had warned several of the campers, but not all of them assigned to that area. He did not, however, tell them that a dam had failed or that a flood was approaching; rather, he suggested, apparently without urgency, that it might be wise for campers to evacuate the area. Neither Terry nor Rosemary Coates received any warning from Ranger Schultz, although they did have second-hand information that campers were being warned to leave the area. At that time, they could see what Rosemary Coates described as a "little water," but nothing to warn them of the actual situation. This was approximately 7:15. The Coates had planned to leave the Aspenglen Campground that day anyway. While Rosemary Coates woke the children and prepared to leave, Terry Coates went to the parking area, got his camera from the car, and began taking pictures. After she had packed up, Mrs. Coates heard a loud noise, saw a rush of water, and began to move to high ground with the children. She had no knowledge at that point of where her husband was. It is, however, apparent that he had returned to the car because his camera was later found there. The testimony shows that witnesses saw Terry Coates and Bridget Dorris, who also died in the flood, crossing the footbridge to the island portion of the campground.

While the decision to warn was being made and the subsequent events were unfolding, the water, freed from Lawn Lake Dam, was moving down the Roaring River

Drainage and entering the west end of Horseshoe Park. This situation was known to the park rangers by approximately 6:45. As more and more water entered the park, it inevitably flowed to the lower end, putting increasing pressure on Cascade Dam. At about 7:40 a.m., Cascade Dam failed, sending a flood of water into the Aspenglen Campground. Terry Coates was drowned by those flood waters as they passed through the campground.

■ Although the testimony indicates a good deal of ranger activity during the course of these events, the Court finds by a preponderance of the evidence that the conduct of the Defendant was negligent in the following respects: (1) The Defendant failed to post an observer at the Cascade Dam to monitor the flood waters and their impact on the dam; (2) they failed to have a ranger in Aspenglen Campground at all times during the flood; (3) they failed to give adequate warning of the danger resulting from the failure of the dam to Terry Coates; and (4) they failed to maintain or implement a plan for dealing with emergencies, such as the one involved here.

On the issue of damages, the Court finds that Terry Coates' widow and two minor children sustained a pecuniary loss, as a result of his death, in the amount of Eight Hundred Thousand Dollars ($800,000). Since the time of his death, Rosemary Coates and her children have received Social Security survivor benefits from the Social Security Administration. At the time of trial, the amount paid to them, collectively, was $10,259. Because of her remarriage in January of 1985, Rosemary Coates is no longer eligible to receive benefits; Marcian and Adam, however, will continue to receive payment until each has attained the age of 18. Extrapolating from the current rate of payment and making reasonable projections, it appears that Marcian is entitled to an additional $9,036 and Adam to an additional $13,806.

### Failure to Inspect

Turning to the failure of the Lawn Lake Dam, which was the precipitating event, the Court finds that, although the dam is located within the boundaries of the Rocky Mountain National Park, it was, in fact, built in 1902 by the Farmers Irrigation Ditch and Reservoir Company and is still owned by them pursuant to an easement granted them by the Government. Although the federal Government had never formally inspected the dam, it was inspected in 1975, 1977, and 1978 by a Colorado State Engineer. It was scheduled for federal inspection in 1982 on a date later than July 15. The most probable cause of the dam's collapse was rapid erosion caused by water seeping through a breach in the junction of an inlet pipe and a valve. Since it appears that such erosion would be extremely rapid, it is unlikely that a normal inspection of the dam would have disclosed the defect unless that inspection took place within a few hours prior to its failure.

It may well be that, as Plaintiffs allege, Lawn Lake Dam was a ticking bomb. Inspection by the federal Government may or may not have revealed critical structural defects, including the one which appears to have been the most probable cause of the dam's failure on July 15, 1982. The record in this case is such that the Court finds Plaintiffs have not shown by a preponderance of the evidence that the federal Government's failure to inspect was a proximate cause of the death of Terry Coates.

### Failure to Have a Plan in Place

Rocky Mountain National Park has been preserved by the federal Government, as have all of the national parks, from the incursions of a technological society. It is made available to lovers of parks and those who enjoy ranging freely through what nature has offered in that section of the country. For those who wish to utilize these preserved enclaves, the Government exacts a monetary fee, thereby creating a specific legal relationship between itself and those who have paid for this special privilege. Because these national parks are outdoors and, therefore, subject to extreme and sometimes unexpected weather changes, structural failures such as the one at issue here, other flash floods, and major fires which occur, changes may be sudden

and dramatic (because of acts of God or foibles of man). Therefore, the Government, in creating this relationship with citizens, also creates a duty for itself to develop orderly procedures for dealing with emergencies. It is imperative to have a plan in place because in such situations there is little time for reflection. Priorities should be established before an emergency arises; otherwise personnel are unprepared to deal with them.

Such appears to be the case here. Many well intentioned and otherwise well trained rangers were inadequately prepared to cope with the breach in Lawn Lake Dam. It appears, for example, that the rangers did not even know how much water was being held back by the dam. Elementary lapses, obvious with the clarity of hindsight, could have been avoided through the development of orderly procedures for warning and evacuating people in the park in the event a crisis arose. There was a duty to plan, the Government failed to develop a plan, and the Court here finds that that failure to have a plan in place was a proximate cause of the death of Terry Coates.

### Failure to Warn

The events of July 15, 1982 were not atypical of emergencies. The situation was an evolving one and, particularly in the absence of a plan, there is a need to assimilate, correlate, and synthesize occurrences so as to make decisions in a reasonable fashion. Therefore, the Court's analysis must track as closely as possible decisions which would be reasonably made by persons at the time of the occurrence. The Court believes that Lawn Lake Dam had burst by 6:23 a.m. This resulted in the constant flow of a substantial stream of water down the side of the mountain. It would be unreasonable not to know that this water would hit the bottom with high velocity and would probably back up to the west of the trail area. The first major mistake made by the rangers was to assume that Horseshoe Park could absorb all of the water. At some point that belief became unreasonable and it should have

become apparent that Cascade Dam was a focal point of the flood waters. In fact, poised as it was above the campground area, Cascade Dam was the key to what would occur downstream. It was absolutely critical that there be someone there to monitor what was happening at Cascade Dam and be prepared to act immediately.

There had been attempts earlier that morning to warn persons in the walk-in sites. Ranger Schultz had been dispatched to warn campers of the possibility of a flash flood. He was apparently given no indication of who was to be warned and with what sense of urgency the message was to be conveyed. It appears that, on his own, he also notified people in the island camp sites. The evidence shows that he told some that they had one to one and one-half hours to leave. It is clear that his tone was not one of urgency and that the information he conveyed was insufficient to alert them to the potential magnitude of the emergency. It seems obvious to the Court that the ranger's desire not to cause panic had to be balanced against the need to motivate the campers to clear the area in an expeditious manner. Moreover, Schultz did not warn those campers who were not presently in the immediate area, nor did he consider that others might have been hiking or exploring in these areas even though they did not actually have tents there. The exercise of reasonable care mandated, at a minimum, the issuance of careful and complete warnings to all of the people who were camped in or otherwise using areas of the park which were downstream from Lawn Lake Dam. The failure to issue these warnings constitutes negligence and, the Court here finds that that negligence was a proximate cause of the death of Terry Coates.

### Damages

■ The first issue to be considered here is that of comparative negligence. Many of the same factors which the Court has just discussed with respect to the Government also apply to Terry Coates. This is not a situation which happened all at once; it evolved. While it is true that he was

never given direct notice of the potential flooding caused by the breach in the dam, Terry Coates and his wife did receive indirect notice from another camper concerning possible flooding. There was, as well, an increased level of activity within the campsites occasioned by people moving, albeit slowly, to evacuate the area. There was a general low level of information about the flood and at some point, the environment of the campground began to change. In fact, Terry Coates was sufficiently impressed with the awesomeness of the rising waters to take pictures. The pictures which he had taken establish clearly that, by reason of his own observation, Terry Coates had knowledge that the water was rushing in and that the water level was rising. He did not have much information, but the Court believes that it was enough to require him to take some reasonable steps for his own safety.

There are substantial discrepancies between the descriptions of the physical situation in the campground in the depositions of Wayne Haymon and Mrs. Thomas, the mother of Bridget Dorris, the other decedent. The deposition of Wayne Haymon described a situation of escalating seriousness, including an increase of noise, a rising level of churning, angry water, and a change in the nature and appearance of the water from clear to muddy. Mrs. Thomas, on the other hand, tendered a report which minimized the potential for danger and, seemingly, excused the decedents' failure to leave the area more quickly. The Court is inclined to give greater credence to Mr. Haymon's deposition because it has a ring of truth and, more importantly, much of what he says is corroborated elsewhere in the record. The Court fears that, under the circumstances, Mrs. Thomas may have suffered substantial residual guilt as a result of her daughter's tragic death. Wayne Haymon had no personal interest in the litigation (either directly or indirectly), and there is no indication of any motivation for subliminal and unintentioned shading of the facts. The Court finds that Terry Coates had notice (albeit inadequate), had time to remove himself safely from the endangered area, and took inadequate steps to protect himself.

The Court has found that the actual pecuniary loss sustained by Rosemary Coates and her children was $800,000, and now holds that the negligence attributable to the United States Government is 60% of the total negligence which occurred in this case, and that attributable to Terry Coates is 40%. Therefore, the total liability of the Government to the Plaintiffs is Four Hundred Eighty Thousand Dollars ($480,000).

## CONCLUSIONS OF LAW

The Government has argued that the United States is entitled to offset that portion of Social Security payments made to Rosemary Coates and the children which were contributed by the Government. They concede that the amount which was actually contributed by Terry Coates and his employers is a collateral source and, therefore, is not appropriately considered as offset. The Government cites the case of *Steckler v. United States*, 549 F.2d 1372 (10th Cir.1977) which is apparently the only case applying Colorado law to the issue of offsetting a Federal Tort Claims Act judgment with Social Security benefits. In that case, the Court of Appeals upheld, as proper, the offsetting of that amount of Social Security benefits which was not attributable to the direct contributions of the employee and his employers.

The Plaintiffs counter by first noting that the Social Security Fund is a separate fund from the general treasury and they argue that all amounts contributed by all workers and all employers to the fund are collateral sources. As support for this position, they cite *Smith v. United States*, 587 F.2d 1013 (3rd Cir.1978). In that case, the court performed rather extensive analysis of the approach used by other circuit courts of appeals in dealing with the collateral source doctrine and its application to the Federal Tort Claims Act. Generally, federal courts seem to hold that there is a distinction between those benefits which come from unfunded general revenues and

those which come from a "special fund supplied in part by the beneficiary or a relative upon whom the beneficiary is dependent." Two of the cases considered were *Steckler v. United States*, supra, and *United States v. Harue Hayashi*, 282 F.2d 599 (9th Cir.1960), which dealt specifically with the application of the doctrine to Social Security benefits. In *Harue Hayashi* the court specifically held that Social Security survivor benefits are "collateral" to an FTCA recovery, finding that:

"The money which goes into this fund is provided by a system of excise taxes on employers and income taxes on employees, designed to be actuarially sound and self-supporting."

Again, in *Steckler*, the court dealt with Social Security payments and their analysis concluded that, because the Government has supplemented the fund when necessary, some burden should rest on a plaintiff to establish, if possible, that portion contributed by the Government so as to permit offset of other portions as collateral sources.

The court in *Smith* then states its agreement with the Ninth Circuit in *Harue Hayashi* that:

"Where state law recognizes the 'collateral source' doctrine, Social Security benefits should not be deducted from a recovery under the Federal Tort Claims Act. FTCA recoveries come out of general revenues; Social Security benefits are funded almost entirely from employee and employer contributions ... The Government here did not argue that a FTCA recovery must be reduced by that portion of Social Security benefits attributable to the Government's contribution out of general revenues. Nevertheless, we are constrained to note our disagreement with the Tenth Circuit in *Steckler*, supra, and decline therefore to adopt its approach. We believe that the Government's payments are so minimal and so difficult to trace that such an approach would be impracticable."

The Court believes that this is a more realistic analysis of this issue and finds that, since it is virtually impossible to ascertain accurately the portion of the payments contributed by the Government, *Steckler*, considered in its entirety, is not fundamentally inconsistent with the holding in *Smith*. It is, therefore, held that the Social Security payments made to Rosemary Coates and her children should not offset the damage award made to them in this Order.

There were also several legal findings made during the pretrial stages which the Court now incorporates as a part of this Opinion.

Because the Defendant in this case is the United States, some special procedural determinations were necessary. Title 28 U.S. C.A. § 2674 subjects the Government to liability in the same manner and to the same extent as a private person under like circumstances. The choice of law decision is governed by 28 U.S.C.A. § 1346(b) which provides that the liability of the United States will be determined by the law of the place where the act or omission occurred. Therefore, the applicable standard to be used in assessing the Government's liability is that of a private landowner operating a campground in Colorado.

■■■■ A landowner in the State of Colorado is charged with the obligation to discover dangers and take relevant precautions and to warn of those dangers which he knows or should know exist to the same extent that any reasonable man in view of the probability or foreseeability of injury to persons on the land would be required to do. *Mile High Fence Company v. Radovich*, 175 Colo. 537, 489 P.2d 308; *Hartzell v. United States*, 539 F.2d 65 (10th Cir. 1976). One factor in ascertaining the existence and extent of the landowner's duty and conduct is the plaintiff's status as trespasser, licensee or invitee. *Mile High Fence Company v. Radovich*, supra. Because the Plaintiffs paid a monetary fee for the privilege of camping in Rocky Mountain National Park, a special relationship was created which required the United States to treat them as licensees.

The Court concluded that the version of comparative negligence which has been adopted by Colorado and set out in *Colora-*

*do Revised Statutes,* § 13–21–111, permits recovery by a plaintiff whose negligence is less than that of the defendant, but requires that his damages be reduced by the percentage of negligence attributable to him.

 Finally, the Court holds that the conduct of the United States in this case is not covered by the statutory exceptions to tort liability set out in the Tort Claims Act, 28 U.S.C.A. § 2680(a)(h). The Government's failure to develop an adequate emergency plan and failure to give adequate warning to all campers is not comprehended in the conduct which Congress intended to protect through enactment of that section of the Tort Claims Act. *United States v. S.A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines),* — U.S. ——, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984); *Hylin v. United States,* 715 F.2d 1206 (7th Cir.1983); *Universal Aviation Underwriters v. United States,* 496 F.Supp. 639 (D.C.Colo.1980).

For all of the reasons set forth in this Memorandum Opinion, judgment is hereby entered on behalf of Plaintiffs in the amount of Four Hundred and Eighty Thousand Dollars ($480,000) on this 6th day of May, 1985.