This is a wrongful death case. The action was filed by the deceased's father, who alleged that a Geneva County road crew released a large body of water and caused a flood and that the flood drowned his son, who was hunting downstream. The water had collected behind a beaver dam blocking two large culverts under a bridge on a county highway. The trial court entered summary judgment in favor of all the defendants, who included Geneva County, the Geneva County Commission, and Jerry Sellers, Geneva County's road and bridge superintendent.
 Facts
On the morning of January 4, 1988, a Geneva County road crew began work breaking beaver dams throughout the county. Beavers build dams in front of bridge culverts and eventually stop the flow of water in the creeks. These dams must be broken in order to keep the water from flowing over the road and also to keep the beavers from removing dirt from the shoulder of the road and undermining the pavement of the road.
The evidence shows that a four-man road crew left the county's road and bridge maintenance yard that morning between 7:30 and 8:00 o'clock. They broke two other beaver dams before arriving at the dam *Page 284 
on Ten Mile Creek on County Road 4. The crew saw that the dam-breaking machine, a truck mounted backhoe, was needed to break the dam, which blocked both culverts under the road. They picked up this machine from a previous location and took it to the dam. One of the crew members testified that it took approximately 10 minutes to set up the machine and then 30 to 40 minutes to clear one of the two culverts. The road crew all testified that they were finished breaking the dam to the extent of clearing one of the two culverts by 10:40 a.m.
Paul Kennedy, one of the residents living on County Road 4, said he drove by the road crew between 10:00 and 11:00 a.m. that morning, following his usual routine. He said he observed the crew working during that time as he drove around them on his way to Hartford.
Mr. Odom, a member of the road crew, testified that the crew cleared one of the two culverts blocked by the dam. He stated that as they broke the dam blocking the first culvert the force of the water did not appear to him to be dangerous. He also testified that while the water will come out in a powerful stream, it will not be released all at once. The other road crew members expressed similar views as to how the water escaped when the dam was broken.
Mr. Odom also testified that while he could not have withstood the force of the water up to 10 or 15 feet downstream, past that point the force of the released water would not have been too strong to withstand. However, he did state that he and two of the other crew members would think of warning persons downstream the next time a beaver dam was broken.
The county road and bridge superintendent, Jerry Sellers, testified that he did not believe a dangerous condition was created downstream by the release of the water. He was joined in this view by three other witnesses: Mr. Howell, a Geneva County commissioner; one of the road crew members; and the crew foreman.
On this same morning, 19-year-old Jeffrey Avery left his home between 6:50 and 7:00 a.m.[1] to go deer hunting alone. The Avery farm, and specifically the area where Jeffrey was hunting, is located approximately one mile downstream from the beaver dam on County Road 4.
Jeffrey was expected to return home around 9:30 a.m. to help his brothers load livestock onto a truck for a routine trip to market. When Jeffrey had not returned home by 9:30, his brother Frank Lloyd Avery[2] went to look for him. Frank testified that he went to the family property running along the creek. He said he found the woods full of water and that his two or three calls for Jeffrey brought no response.
Frank returned to the house, according to Mrs. Avery, at approximately 9:30. She remembered Kenneth Avery making calls to the market for the prices on livestock. When finished with his calls, just after 9:34, Kenneth Avery left the house in search of Jeffrey. He said he found Jeffrey's body at approximately 10:00 a.m. in water that was about chest deep. He returned to the house to inform the family.
Sheriff Whittle and Deputy Tice arrived at the creek at approximately 11:30. Upon their arrival, the sheriff said, the depth of the creek was 3 to 4 feet. The sheriff testified that when he left an hour later, the level of the creek had dropped approximately 1 foot. The sheriff said he found no evidence of foul play or of any struggle in the area.
Jeffrey's father, Roger Avery, Sr., had been to the creek two days before Jeffrey's death. He testified that the creek was so shallow that he could "cross it with his shoes on." Three days after his son's death, Mr. Avery went to the scene to *Page 285 
study the condition of the land. He concluded that a large body of water had come down the creek and flooded the area.
Jeffrey's brother testified that one of the road crew members, Ronnie Odom, told him that the dam was broken between 9:00 and 10:00 a.m. The record shows further evidence of a possible irregularity in that the daily activity sheets used by the road crew were more detailed for January 4 than for any other day. The testimony in the record showed that the sheet for January 4 indicated that the road crew broke the dams on County Road 4 at 10:30 a.m. There were no other sheets discussed in the record in which the specific time for work performed had been noted.
The record shows that Jeffrey had been taking medication for seizures since age 13, although he had been known to have had only one seizure during his lifetime. He saw a doctor in Dothan every six months for these seizures and took his medication regularly.
The defendants filed a general motion for summary judgment. The court granted that motion, and the plaintiff appeals from the defendants' summary judgment.
 Issues
The plaintiff alleged in his complaint that the releasing of a large body of water without warning to Jeffrey Avery or anyone else who might be located downstream from the pond constituted negligence as well as an abnormally dangerous activity. He further alleged that Jeffrey's death was proximately caused by the release of this water, that the release of the water constituted a trespass onto his property, and that the defendants' actions constituted wanton behavior. We note that neither the plaintiff nor the defendants have raised in any manner the issue of sovereign immunity.
The plaintiff claims that the trial court erred in entering summary judgment against all counts of the complaint. He contends that there is a genuine issue of material fact, namely the exact time the county road crew released the water from the beaver dam into the creek. The defendants claim that there was no evidence presented by the plaintiff of a duty owed by the defendants or of a breach of duty. Additionally, the defendants claim that the plaintiff has not shown that any actions of the defendants proximately caused the death of Jeffrey Avery.
 Discussion
We review a summary judgment to determine if there is any genuine issue of material fact and if the movant is entitled to a judgment as a matter of law. A.R. Civ. P. 56; Tripp v. Humana,Inc., 474 So.2d 88 (Ala. 1985). We note that this case was filed after June 11, 1987, and is therefore subject to the "substantial evidence" rule. See Ala. Code 1975, § 12-21-12. Therefore, in order to defeat a properly supported motion for summary judgment, the plaintiff must present evidence of such quality and weight that fair minded persons in the exercise of impartial judgment can reasonably infer the existence of the facts sought to be proved. Economy Fire Cas. Co. v. Goar,551 So.2d 957, 959 (Ala. 1989); see also Bass v. SouthTrust Bank ofBaldwin County, 538 So.2d 794, 797-98 (Ala. 1989); Rowden v.Tomlinson, 538 So.2d 15 (Ala. 1988) (Jones, J., concurring specially). The facts and evidence should be construed in a light most favorable to the plaintiff as the non-moving party in this case. Best v. Houtz, 541 So.2d 8 (Ala. 1989).
 Negligence
In summary judgment cases, after the defendant has made a prima facie showing that it had no duty or that it was not negligent, the plaintiffs burden is to present substantial evidence of the following: (1) a duty owing from the defendants, (2) a negligent breach of that duty, (3) which proximately caused (4) the plaintiff to be injured or damaged.Jones v. General Motors Corp., 557 So.2d 1259 (Ala. 1990).
 Did the Defendants Have a Duty to Warn Persons Downstream?
The defendants claim that they had no duty to warn persons downstream prior to breaking the beaver dam and that even if a *Page 286 
duty was owed, it would be only to persons within the immediate vicinity of the beaver dam. We find no Alabama cases guiding us as to the duty owed under these specific facts.
Generally, however, the defendants here owed the plaintiff the duty to not change the course of nature so as to interfere with the enjoyment of the subservient premises. SeeSloss-Sheffield Steel Iron Co. v. Webb, 184 Ala. 452, 455,63 So. 518, 519 (1913). In that case, a landowner who had created a pond by changing the natural flow of water was liable for damage to the land of the lower owner when the dam broke. Further, we find that the liability of a defendant for depositing or placing foreign substances upon the lands of the plaintiff has been stated in Sloss-Sheffield Steel Iron Co.v. McCullough, 177 Ala. 448, 456, 59 So. 210, 213 (1912) (quoting Alabama Western R.R. v. Wilson, 1 Ala. App. 306,55 So. 932 (1911)):
 " 'One may not, either voluntarily or negligently, cast earth or other substance from his own ground on a neighbor's, or upon his own bring or erect anything, or change the natural position of anything from which the air, the moving water, or any other force of nature will bear to another, or other land, what is distinctly injurious to him; or, by any excavation, structure, or other change of his premises from their natural condition, render them unsafe to other persons and their property lawfully thereon; while yet these restraints will not be drawn so closely as substantially to deprive him of the use of his lands, or to render him answerable for inevitable accidents injuring others.' "
While neither McCullough nor Webb speaks specifically to a death caused by the intentional release of water by breaking a dam or to any duty to warn, those cases are sufficient to show that Alabama does recognize that an owner or one who maintains a dam should not cause the property of the lower landowner to be rendered unsafe by his acts in connection with that dam.
We find further that the plaintiff here must prove that the defendants acted in a negligent manner and that their negligence caused the death of the plaintiff's intestate. SeeEllis v. Alabama Power Co., 431 So.2d 1242, 1245 (Ala. 1983). One who owns or operates a dam owes a duty to the lower owners to exercise reasonable care. Id. While the typical scenario, as found in Ellis, involves a large hydroelectric dam, the same general rule is applicable to this situation. See also, M.C.West, Inc. v. Battaglia, 386 So.2d 443 (Ala.Civ.App. 1980).
Several other jurisdictions have found a duty to warn those persons downstream when the possibility of a flood exists. InCoates v. United States, 612 F. Supp. 592 (C.D. Ill. 1985), the court held that the Government had a duty to warn persons who were camping down the mountain from a dam that the area park rangers knew had broken. The court found that there was sufficient time to warn the campers, and in fact one of the rangers had warned several persons, but without any urgency. The Government was found liable for the wrongful death of one of the campers who drowned after the flood waters reached the lower campsite where he was taking pictures.
In Peterson v. United States, 367 F.2d 271 (9th Cir. 1966), the plaintiffs sued to recover money damages for injury and loss of property allegedly caused by negligence when, without warning of any kind to the plaintiffs, a group of engineers attached to Ladd Air Force Base at Fairbanks, Alaska, caused to be dynamited an ice jam that had accumulated from natural causes in a bend of the Chena River. The dynamiting of the jam caused a large volume of ice and water to be discharged downstream, in turn causing damage to vessels and miscellaneous equipment five miles downstream. The district court determined that the Government had a complete legal defense under the Flood Control Act of 1928. The court of appeals disagreed, and remanded the case to the district court for a determination of the Government's liability.
Finally, in Chrysler Corp. v. Dallas Power Light Co.,522 S.W.2d 742 *Page 287 
(Tex.Civ.App. 1975), a summary judgment entered in favor of the defendant, Dallas Power Light Company ("DP L"), was found to be improper. The court stated that "Texas law does recognize a duty to warn on the part of the person who creates a dangerous situation, although without negligence on his part."522 S.W.2d at 744 (citations omitted). While the court found that DP L did not create the flood, which caused damage to 545 vehicles stored by the plaintiff, it determined that DP 
L "created, maintained, and operated the dam, the presence of which posed nearly all of the problems of proper conduct."Id.
We conclude that the summary judgment entered in this case in favor of the defendants as to negligence was error. The jury should be allowed to determine if the defendants created a dangerous situation downstream by the breaking of the dam and, thus, had a duty to warn those who might be affected by the sudden surge of water. We therefore reverse the summary judgment in favor of all the defendants as to this issue, and remand for further proceedings.
 Proximate Cause
The defendants claim that upon their motion for summary judgment they made a prima facie showing that their acts did not proximately cause Jeffrey's death, and that the plaintiff has failed to rebut that showing by presenting substantial evidence that the release of the water was the proximate cause. The defendants further claim that it was not foreseeable that a person one mile below the beaver dam would suffer any harm or injury.
The record clearly shows that no one knows exactly what time or by what cause Jeffrey Avery died. However, as we have previously noted, summary judgment is rarely appropriate in a case involving a claim alleging negligence. Tripp v. Humana,Inc., 474 So.2d 88, 90 (Ala. 1985). The issue of proximate causation is "not easily established to a legal certainty and the resolution of [it] . . . is a prerogative reserved to the jury." Id. See also, Ex parte Patterson, 561 So.2d 236
(Ala. 1990) (plaintiff's injuries found to be causally connected with his employment "notwithstanding the fact that the circumstances surrounding the accident itself remain largely unexplained").
The plaintiff has presented substantial evidence that the creek was flooded between 9:00 and 10:00 on the morning of January 4, 1988. Jeffrey Avery was found, according to the plaintiff's evidence, at approximately 10:00 a.m. While the testimony of the road crew shows that they completed breaking the dam at 10:40 a.m., the testimony of Roger Avery, Jr., shows that a member of the road crew, Ronnie Odom told him that the water was released from the dam between 9:00 and 10:00 that morning. Mr. Odom's testimony also shows that he made such a statement to Mr. Avery.
The defendants contend that because they have presented evidence that the dam was broken sometime between 10:00 and 10:40 a.m., and that because Jeffrey was found at approximately 10:00, there can be no liability on the part of the county. This conflict in the evidence should be presented to the jury.
Further, this Court has held that if injury or damage is "a natural and probable consequence of the negligent act or omission which an ordinarily prudent person ought reasonably to foresee would result in injury," then liability will be imposed. Vines v. Plantation Motor Lodge, 336 So.2d 1338, 1339
(Ala. 1976). See Ducey v. United States, 830 F.2d 1071, 1073
(9th Cir. 1987) ("A defendant has a duty to warn foreseeable victims of foreseeable harm"; Government had a duty to warn downstream landowners when it knew of the high probability of a 100-year flood). See, also, Jefferis v. Chicago N.W. Ry.,147 Iowa 124, 124 N.W. 367 (1910) (evidence held sufficient to warrant determination by a jury of whether defendant's employees were negligent in causing material accumulating in the stream to block the stream, causing a flood).
Because we find a jury question as to whether there was a duty to warn on behalf of these defendants and because we *Page 288 
hold that the determination of proximate cause is a question also reserved for a jury, we reverse and remand this case to the trial court for further proceedings.
 Abnormally Dangerous Activity
The plaintiff contends that the manner in which the large body of water backed up behind the county highway was released constituted an abnormally dangerous activity. The plaintiff relies on Harper v. Regency Development Co., 399 So.2d 248
(Ala. 1981), in specifically claiming that the release of the water created "a high degree of risk of some harm to the person" and that there was a "likelihood that the harm that result[ed] from it [would] be great." Id. at 253.
Harper involved claims arising out of blasting operations on Red Mountain in Birmingham. This Court adopted the factors set forth in Restatement (Second) of Torts, § 520 (1977), to aid the jury in determining whether an activity is abnormally dangerous and therefore would support a finding of negligence.
The Harper Court stated:
 "A finding, guided by consideration of factors outlined in the Restatement, that the blaster was 'one who carries on an abnormally dangerous activity' is a finding of negligence — the breach of a legal duty — and, a further finding that such conduct proximately damaged another, renders the blaster liable therefor. Ordinarily, both of these determinations will be issues of fact for the jury." (Emphasis added).
We find that the analysis and factors used in Harper to determine negligence in blasting cases should be used in determining whether the defendants here have carried on an abnormally dangerous activity that constitutes negligence. AsHarper said, at 253, these determinations are "issues of fact for the jury."
 Trespass
The plaintiff's complaint further alleges that the "release of the large body of water by the Defendants and their employees constituted a trespass upon the property of the Plaintiff." We note that the plaintiff does not allege a trespass to the person of the decedent, Jeffrey Avery. At the outset, we note that trespass to real property has apparently not been considered by our appellate courts in the context of the Alabama wrongful death statute, Ala. Code 1975, § 6-5-410. Section (a) of that statute provides as follows:
 "A personal representative may commence an action and recover such damages as the jury may assess in a court of competent jurisdiction within the state of Alabama, and not elsewhere, for the wrongful act, omission or negligence of any person, persons or corporation, his or their servants or agents, whereby the death of his testator or intestate was caused, provided the testator or intestate could have commenced an action for such wrongful act, omission or negligence if it had not caused death."
Although there appears to be no earlier case explicitly discussing whether trespass can serve as a "wrongful act" that would establish a cause of action under our statute, our law is well settled that trespass to real property is a wrongful act that intrudes upon the possessory interest of the owner. SeeCox v. Stuart, 229 Ala. 409, 157 So. 460, cert. denied,26 Ala. App. 231, 157 So. 458 (1934); Barnett v. Bolling,37 Ala. App. 612, 73 So.2d 575 (1954). Certainly we have held that a trespass is a wrongful act that can result in a claim for personal injury proximately caused by the trespass. Engle v.Simmons, 148 Ala. 92, 41 So. 1023 (1906). It would follow that a trespass to real property could serve as a "wrongful act" so as to give rise to a cause of action under our wrongful death statute.
Ala. Code 1975, § 6-5-410, also requires, however, that the decedent could have commenced an action for the wrongful act had that act not resulted in his death. Our next consideration must therefore be whether Jeffrey Avery could have commenced an action for trespass on the property in question. Examination of the record indicates that the plaintiff is the owner of the property and has a clear right *Page 289 
to its possession, but there is no evidence that would support an inference that the decedent had any possessory interest in the property.
Our law on trespass is plain that the gist of any trespass action is the interference with a right to possession of property. Absent such right of possession, there can be no action based on trespass. Dollar v. McKinney, 272 Ala. 667,133 So.2d 673 (1961); Sutton's Music Co. v. Top Music Co.,377 So.2d 1092 (Ala.Civ.App. 1979). The effect of this rule is that the decedent did not have standing to bring a trespass action against the defendants at the time the dam was broken. Since the plaintiff can maintain only those actions in wrongful death that the decedent would have had, if the act had not caused death, and the decedent would have had no action in trespass, the trial court properly entered summary judgment for the defendants on the trespass claim.
 Wantonness
Finally, the plaintiff claims that the actions of the defendants constituted wantonness.
 "Wantonness has been defined as the conscious doing of some act or the omission of some duty [with] knowledge of existing conditions and while conscious that, from the doing of such act or the omission of such duty, injury will likely or probably result, and before a party can be said to be guilty of wanton conduct it must be shown that with reckless indifference to the consequences he consciously and intentionally did some wrongful act or omitted some known duty which produced the result."
Roberts v. Brown, 384 So.2d 1047, 1048 (Ala. 1980). "The most crucial element of wantonness is knowledge, and while that element need not be shown by direct evidence — it may be made to appear by showing circumstances from which the fact of knowledge is a legitimate inference." Id.
The defendants made a prima facie showing that there was an absence of wantonness; the plaintiff has not shown substantial evidence for the jury to consider on the question whether the conduct of the defendants constituted wantonness. As to the wantonness claim, the summary judgment is due to be affirmed.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
SHORES, HOUSTON and KENNEDY, JJ., concur.
JONES, J., concurs specially.
MADDOX and STEAGALL, JJ., dissent.
[1] We note that the testimony of Deputy Kenneth Tice shows that Jeffrey left to go hunting at approximately 6:00 a.m. and had not returned by 8:00 or 8:30 a.m. His testimony appears inconsistent with that of other witnesses, however, when he states that the call into the sheriff's department was received about 10:00 a.m. All other testimony indicates that the call actually came in at 10:45 a.m.
[2] The testimony shows that Frank Lloyd is referred to throughout the record as both "Frank" and "Lloyd." We will refer to him as "Frank."